## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Russ Gordon and Cathy Stackpoole,

      Plaintiffs,

vs.                                                    Civil Action No.:  23-12812

The City of Hamtramck, the Hamtramck          Hon. David Lawson
City Council, and Mayor Amer Ghalib,
in his official capacity, only,                        Magistrate Judge David Grand

      Defendants.

_____ _____/

| | |
|---|---|
| Marc M. Susselman (P29481) | Odey Meroueh (P76460) |
| Attorney at Law | Meroueh & Hallman LLP |
| Attorney for Plaintiffs | Attorney for Defendants |
| 43834 Brandywyne Rd. | 14339 Ford Road |
| Canton, Michigan 48187 | Dearborn, Michigan 48126 |
| (734) 416-5186 | (313) 582-7469 |
| marcsusselman@gmail.com | okm@mhatlaw.com |

_____/

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by and through their attorney Marc Susselman, move for summary judgment pursuant to Fed. R. Civ. P. 56 as to all of the federal claims pled in Plaintiffs' Second Amended Complaint, and in support of the motion state as follows:

1.     Plaintiffs commenced this action on November 6, 2023.  They filed their Second Amended Complaint by leave on June 24, 2024.

2.     The lawsuit relates to a Resolution which the City of Hamtramck

enacted on June 13, 2023, relating to what flags could be displayed on flagpoles located on Joseph Campau Ave.  The Resolution had the effect of prohibiting the display of the Pride Flag on any of the flagpoles.

3.     After the Resolution was passed, the Plaintiffs, who were members of the Hamtramck Human Relations Commission, proceeded to raise the Pride Flag on one of the flagpoles on July 9, 2023.  A member of the Hamtramck City Council, Mohammed Hassan, contacted the City Manager and demanded that the Pride Flag be removed.  The City Manager directed the Hamtramck police to remove the Pride Flag.

4.     On July 11, 2023, the Hamtramck City Council passed a Resolution removing the Plaintiffs from the Human Relations Commission on the basis that they had violated the Resolution relating to the display of flags.

5.     Plaintiffs maintain that the Resolution which was passed on June 13, 2023, violates the Freedom of Speech Clause of the First Amendment of the United States Constitution; the Establishment Clause of the First Amendment of the Constitution; and the Equal Protection Clause of the Fourteenth Amendment of the Constitution.  They also maintain that the Resolution removing the Plaintiffs from the Human Relations Commission violated their freedom of speech under the First Amendment, and that the Resolution removing the authority of the Human Relations Commission to determine what flags will be displayed violated the First

Amendment and the Equal Protection Clause.  They are seeking equitable relief, as well as damages.

6.     There is no genuine issue as to any material fact and Plaintiffs are accordingly entitled to summary judgment regarding the federal claims pursuant to Fed. R. Civ. P. 56.[1]

7.     Pursuant to LR 7.1, Plaintiffs' counsel contacted the Defendants' attorney by email on September 12, 2024, and requested his concurrence in the motion.  Defendants' attorney did not respond.  At a deposition on September 18, Plaintiffs' and Defendants' counsel conferred in person regarding Plaintiffs' proposed motion for summary judgment, and Defendants' counsel refused to concur.

The motion is supported by the accompanying brief.

**WHEREFORE**, Plaintiffs request that the Court grant the motion for summary judgment with respect to all of the federal law counts pled in the First Amended Complaint; enter a declaratory judgment holding that both Resolutions violate the Constitution, enter an Order requiring that both Resolutions be rescinded, requiring that the Pride Flag and the other flags which had been displayed with the Pride Flag be re-displayed, requiring that the Plaintiffs be

---

[1] Since Plaintiffs are seeking summary judgment with respect to the federal claims only, and not the pendent state claims, the motion is technically a motion for partial summary judgment, and will accordingly be filed as such.

reinstating as members of the Human Relations Commission, restore the authority

of the Human Relations Commission to determine what flags will be displayed,

and grant whatever additional relief the Court deems just and proper.

Respectfully submitted,

Marc M. Susselman
Attorney at Law
Attorney for the Plaintiffs
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

Dated:  November 12, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2024, I electronically filed with the

Clerk of the Court the foregoing document using the CM/ECF system which will

send notification of such filing to all counsel of record.

/s/ Marc  M. Susselman (P29481)
Marc M. Susselman
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Russ Gordon and Cathy Stackpoole,

     Plaintiffs,

vs.                                                     Civil Action No.:  23-12812

The City of Hamtramck, the Hamtramck          Hon. David Lawson
City Council, and Mayor Amer Ghalib,
in his official capacity, only,                     Magistrate Judge David Grand

     Defendants.

_____/

| | |
|---|---|
| Marc M. Susselman (P29481) | Odey Meroueh (P76460) |
| Attorney at Law | Meroueh & Hallman LLP |
| Attorney for Plaintiffs | Attorney for Defendants |
| 43834 Brandywyne Rd. | 14339 Ford Road |
| Canton, Michigan 48187 | Dearborn, Michigan 48126 |
| (734) 416-5186 | (313) 582-7469 |
| marcsusselman@gmail.com | okm@mhatlaw.com |

_____/

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**INDEX OF AUTHORITIES**.................................................................. iii

**QUESTIONS PRESENTED** ............................................................... vii

**STATEMENT OF FACTS**....................................................................  1

**STANDARD OF REVIEW** ................................................................. 15

**ARGUMENT**            ......................................................................... 16

**I.    RESOLUTION 2023-82 VIOLATED THE FREE SPEECH
       CLAUSE AND/OR THE ESTABLISHMENT CLAUSE OF
       THE FIRST AMENDMENT, REGARDLESS WHETHER
       THE FLAGPOLES ON JOSEPH CAMPAU AVE. QUALIFY
       AS A PUBLIC FORUM, A LIMITED PUBLIC FORUM,
       OR A NONPUBLIC FORUM.**.................................................... 16

   **A.    The Flagpoles Qualified As A Public Forum And The
          Resolution Violated The Freedom Of Speech Clause
          Because It Was Not Content And Viewpoint Neutral**. . 17

   **B.    The Resolution Violated The Free Speech Provisions
          Even If The Flagpoles Qualify As A Limited Public
          Forum.**         ........................................................... 22

   **C.    Even If The Flagpoles Constitute A Nonpublic
          Forum, The Resolution Violated The First
          Amendment.**....................................................................... 24

**II.   RESOLUTION 2023-82 VIOLATED THE EQUAL
       PROTECTION CLAUSE OF THE FOURTEENTH
       AMENDMENT.** ........................................................................ 35

**III.  RESOLUTION 2023-99 REMOVING GORDON AND
       STACKPOOLE FROM THE HUMAN RELATIONS
       COMMISSION VIOLATED THEIR FREEDOM OF
       SPEECH UNDER THE FIRST AMENDMENT.** ..................... 36

**IV.**    **VIOLATION OF THE FREE SPEECH, ESTABLISHMENT, AND EQUAL PROTECTION CLAUSES REGARDING THE PASSAGE OF RESOLUTION 2023-100**........................    39

**CONCLUSION AND RELIEF**................................................................    39

**CERTIFICATE OF SERVICE** ............................................................    41

**INDEX OF EXHIBITS**  ........................................................................    42

# INDEX OF AUTHORITIES

**Cases**                                                                   **Page**

### Federal

*American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook,*
   375 F.3d 484 (6th Cir. 2004) ......................................................... 25

*Arkansas Ed. Television Comm'n v. Forbes,*
   523 U.S. 666 (1998)...................................................................... 24

*Board of County Comm'rs, Wabaunsee Cty. v. Umbehr,*
   518 U.S. 688 (1998)...................................................................... 38

*Board of Airport Commissioners v. Jews for Jesus, Inc.,*
   482 U.S. 569 (1987)...................................................................... 17

*Board of Ed. of Kiryas Joel v. Grumet*
   512 U.S. 687 (1994)...................................................................... 24

*Butterworth v. Smith,*
   494 U.S 624 (1990)....................................................................... 22

*Carey v. Brown,*
   447 U.S. 455 (1980)...................................................................... 35

*Clark v. Jeter*
   486 U.S. 456 (1988)...................................................................... 21

*Cleveland Area Board of Realtors v. City of Euclid,*
   88 F.3d 382 (6th Cir. 1996) ........................................................... 18

*Cone v. Bell,*
   243 F.3d 961 (6th Cir. 2001) ......................................................... 26

*Cornelius v. NAACP Legal Defense Ed. Fund,*
   473 U.S. 788 (1985)...................................................................... 24

*Deacero S.A.P.I. de C.V. v. United States,*
    996 F.3d 1283 (Fed. Cir. 2021) ...................................................... 27, 32

*Everson v. Board of Education,*
    330 U.S. 1 (1947) ....................................................................... 16

*Ex Parte Young*
    209 U.S. 123 (1908)...................................................................... 36

*Ferro Corp. v. Cookson Group,*
    585 F.3d 946 (6th Cir. 2009) ........................................................ 15

*Flood v. Kuhn,*
    407 U.S. 258 (1972)...................................................................... 28

*Gay Lesbian Bisexual Alliance v. Pryor,*
    110 F.3d 1543 (11th Cir. 1997) .................................................... 23

*Good News Club v. Milford Central School,*
    533 U.S. 98 (2001) ...................................................................... 22

*Healy v. James,*
    408 U.S. 169 (1972)...................................................................... 37

*Hotel Employees & Restaurant Employees Union, Local 100 v*
    *City of New York Department of Parks & Recreation,*
    311 F.3d 534 (2d Cir. 2002) ........................................................ 28

*International Union,*
    459 F.2d 1329 (D.C. Cir 1972)...................................................... 27, 32

*Kaur v. Holder,*
    574 App'x 76 (9th Cir. 2014) ...................................................... 27, 32

*Lamb's Chapel v. Center Moriches Sch. Dist.*
    508 U.S. 384 (1993)...................................................................... 22

*Larkin v. Grendel's Den, Inc.,*
    459 U.S. 116 (1982)...................................................................... 24

*Larson v. Valente,*
    456 U.S. 228 (1982)........................................................................ 24, 34

*Lib v. University of Missouri,*
    558 F.2d 848 (8th Cir. 1977) ........................................................ 37

*Minn. Voters All. v. Mansky,*
    138 S. Ct. 1876 (2018)................................................................... 17

*Monell v. New York City Dept't of Soc. Servs.,*
    436 U.S. 658 (1978)........................................................................ 16

*Mukand, Ltd. v. United States,*
    767 F.3d 1300 (Fed. Cir. 2014) .................................................... 27, 32

*New York Times v. Sullivan,*
    376 U.S. 254 (1964)........................................................................ 16

*Oneida Indian Nation of N.Y. v. State of N.Y.,*
    691 F.2d 1070 (2d Cir. 1982) ........................................................ 28

*Perry Ed. Assn. v. Perry Local Educators' Assn.,*
    460 U.S. 37 (1983) ........................................................................ 17

*Pickering v. Board of Educ,*
    391 U.S. 563 (1968)........................................................................ 38

*Pleasant Grove v. Summum,*
    555 U.S. 460 (2009)........................................................................ 24

*Police Dep't of Chicago v. Mosley*
    408 U.S. 92 (1972) ........................................................................ 35

*R.A.V. v. St. Paul*
    505 U.S. 377 (1992)........................................................................ 17

*Reed v. Town of Gilbert*
    576 U.S. 155 (2015)........................................................................ 17

*Rosenberger v. Rector & Visitors of University of Virginia*
515 U.S. 819 (1995)........................................................................ 17

*Santa Fe Independent School District v. Doe,*
530 U.S. 290 (2000)........................................................................ 25

*Santoso v. Holder,*
580 F.3d 110 (2d Cir. 2009) ........................................................... 33

*Shurtleff v. City of Boston, Mass.,*
42 S. Ct. 1583 (2022)...................................................................... 18, 21

*United States v. Kokinda,*
497 U.S. 720 (1990)........................................................................ 24

*U.S. v. Skidmore,*
998 F.2d 372 (6th Cir. 1993) .......................................................... 26

*Werner v. McCotter,*
49 F.3d 1476 (10th Cir. 1995) ........................................................ 34

*Widmar v. Vincent,*
454 U.S. 263 (1981)........................................................................ 22

*Xin Qiu Lin v. Gonzales,*
231 App'x 94  (2d Cir. 2007) ......................................................... 27, 32

*Zinermon v. Burch*
494 U.S. 113 (1990)........................................................................ 16

### Michigan

*Everett v. Everett,*
319 Mich. 475 (Mich. 1947)........................................................... 5, 30

### Constitution

U.S. Const. amend. I        ......................................................... *passim*

U.S. Const. amend. XIV   ......................................................... 16

**Statutes**

42 U.S.C. § 1983 ......................................................... 16

US Public Law 101-355 ...................................................... 21

**Rules**

Fed. R. Civ. P. 56 ......................................................... 15

Fed. R. Ev. 201 ...................................................... 28, 29

**Miscellaneous**

Esposito, <u>What Everyone Needs To Know About Islam,</u>
    Oxford University Press (2nd Ed. 2011)....................................... 28

Hamtramck Census, 2000-2023.................................................. 32

Henry David Thoreau, "On the Duty of Civil Disobedience"................ 35

Rehman and Polymenopoulou, <u>Is Green a Part of the Rainbow's *Sharia*,</u>
    <u>Homosexuality and LGBT Rights in the Muslim World,</u>
    37 Fordham International Law Journal 1 (2013).......................... 29

The Meaning of The Glorious Qur'an (2002) ....................................... 29

The Quran The Eternal Revelation vouchsafed to Muhammad
    The Seal of the Prophets (1991) .................................................... 29

## <u>QUESTIONS PRESENTED</u>

I.   **Whether Resolution 2023-82 banning the Pride Flag violated the Free Speech provision of the First Amendment?**

    **Plaintiffs answer "Yes."**

II.   **Whether Resolution 2023-82 banning the Pride Flag violated the Establishment Clause of the First Amendment.**

    **Plaintiffs answer "Yes."**

III.   **Whether Resolution 2023-82 banning the Pride Flag violated the Equal Protection Clause of the Fourteenth Amendment.**

    **Plaintiffs answer "Yes."**

IV.   **Whether Resolution 2023-99 removing the Plaintiffs from the Human Relations Commission violated their Freedom Of Speech.**

    **Plaintiffs answer, "Yes."**

V.   **Whether Passage of Resolution 2023-100 violated the First and Fourteenth Amendments.**

    **Plaintiffs answer, "Yes."**

## **STATEMENT OF FACTS**

On May 14, 2013, the City Council of Hamtramck, Michigan, passed Resolution 2013-167, which stated in relevant part (copy of the Resolution is attached as Exhibit 1):

> NOW THEREFORE BE IT RESOLVED by the City Council of the City of Hamtramck that

> FIRST:    The Human Relations Commission is hereby authorized to move forward with their flagpole restoration project.

> SECOND    The Human Relations Commission is hereby authorized to solicit funds from interested parties, individuals or businesses for the sole purpose of the restoration and maintenance of city flagpoles, purchase of flags and plaques and ongoing maintenance of the project.

Resolution 2013-167 placed no limitations on the Human Relations Commission ("Commission") regarding the character of the flags which it chose to display on the city flagpoles. The Commission was granted sole authority to decide what flags would be displayed. The Commission displayed flags on the flagpoles which lined Joseph Campau Ave. which were representative of the residents of Hamtramck who came from different nations. Gordon was the Chairman of the Commission at the time and he raised the flags in May, and lowered them after Thanksgiving, because the winter weather damaged the flags.

On June 8, 2021, the City Council passed Resolution 2021-73 which stated, in relevant part (copy attached as Exhibit 2):

**WHEREAS** the Arts and Culture Commission wishes to hold a ceremony on June 19, 2021 at the Zussman Park flagpole in recognition of Pride month.

**NOW THEREFORE BE IT RESOLVED** by the City Council of the City of Hamtramck, Wayne County, Michigan to approve the display of a Pride flag at the Zussman Park flagpoles during the month of June, 2021.

At the time the Resolution was passed, the Hamtramck administration consisted of Mayor Karen Majewski, and Council persons Al-Marsoumi, Choudhury, Lasely, Alsomiri, and Hassan. A Pride Flag was thereafter raised on the Zussman Park flagpole, which is located across from the Hamtramck City Hall. The Chairperson of the Arts and Culture Commission thereafter inquired about displaying the Pride flag on a flagpole on Joseph Campau Ave. Cathleen Angerer, the City manager, contacted Gordon and asked him if there was a flagpole available on Joseph Campau from which the Pride Flag could be displayed. He indicated that there was. The Chairperson of the Arts and Culture Commission then contacted Gordon and specified what Pride Flag he wanted to be displayed. Gordon ordered the Pride Flag, but it arrived too late in 2021 to be displayed. (*See* Affidavit of Russ Gordon, attached as Exhibit 3.)

In the November, 2021 election, Karen Majewski was replaced by Amer Ghalib as Mayor. Gordon raised the Pride Flag on a flagpole on Joseph Campau Ave. in May, 2022. He was then contacted by Angerer, who informed him that the new City Council wanted the Pride Flag removed. At this point in time, Resolution

2013-167, which gave the Commission sole authority to decide what flags would be displayed, was still in place.  Gordon refused to remove the Pride Flag, and it remained displayed through Thanksgiving, 2022.  Stackpoole became a member of the Human Relations Commission in January, 2023.

Mayor Ghalib convened a meeting, which Gordon attended, specifically to discuss the display of the Pride Flag.  Mayor Ghalib stated that he was receiving complaints from members of the Hamtramck community complaining about the display of the Pride Flag and asking him why he was allowing it.  He indicated that he responded that it was not his fault, that it was the fault of the previous administration.  Gordon interpreted the complaints about the display of the Pride Flag to be based on religious grounds.  (Gordon Affidavit, ¶5)

At the City Council meeting on June 13, 2023, the Council considered passing Resolution 2023-82, titled "Resolution To Maintain And Confirm The Neutrality Of The City Of Hamtramck Towards Its Residents."  The Resolution stated, in relevant part (copy attached as Exhibit 4):

> **WHEREAS**, each religious, ethnic racial, political, or sexually oriented group is already represented by the country it belongs to; and
>
> **WHEREAS**, the City does not want to open the door for radical or racist groups to ask for their flags to be flown; and
>
> **WHEREAS**, this resolution does not in any way, shape or form infringe upon the fundamental right of an individual or business in the City of Hamtramck to engage free speech.  Nor does this resolution limit speech by public employees provided that such employees engage

in such speech in a protected time, manner and place.

**NOW, THEREFOE, BE IT RESOLVED** by the City Council of the City of Hamtramck, Wayne County, Michigan, that the government of the City of Hamtramck does not allow any religious, ethnic, racial, political, or sexual orientation group flags to be flown on the City's public properties, and that only, the American flag, the flag of the State of Michigan, the Hamtramck Flag, the Prisoner of War flag and the nations' flags that represent the international character of our City shall be flown.

Under the terms of the Resolution, displaying the Pride Flag on City flagpoles would no longer be permitted.  During the Council meeting, numerous individuals expressed their opinions, in person and by electronic mail, both in support of, and opposed to, the Resolution.  The meeting was videotaped, and can be seen at https://www.youtube.com/watch?v=RfwM_q9pFKs. (A transcript of the complete proceeding is attached as Exhibit 5.)  In the course of the meeting, several individuals who supported the Resolution indicated that they supported it based on religious grounds, four of whom spoke in Arabic, and were translated by Mayor Ghalib.  (Exhibit 5, pp. 23, 30, 31, and 32)  Several commenters indicated that they opposed the Resolution based on its stemming from religious convictions.   (Exhibit 5, pp. 19, 27, 45, 47, 50, 60, and 63)  Several opposed it based on freedom of speech grounds.  (Exhibit 5, pp. 43, 45, 48, 51, 56, 58, 59, 61, and 65)

Of the 37 Hamtramck residents who appeared in person to comment on the Resolution, 19 opposed the Resolution, and 18 supported it.  Of the 48 emails/letters which were submitted by Hamtramck residents, 47 opposed the Resolution, while

only 1 supported it.  Among the 85 Hamtramck residents who offered an opinion

regarding the Resolution, a total of 66 opposed it, versus 19 who supported it.

Consequently, of the 85 Hamtramck residents who offered opinions at the June 13,

2023, Council meeting, 77% opposed the Resolution.

After the public comments concluded, each of the Council members offered

their opinion regarding the Resolution.   Councilman Choudhury offered the

following comment, in relevant part (Exhibit 5, p. 73):

> But here's the thing, folks.  You guys are welcome to the community.
> You guys welcome to walk to the restaurants, walk to the grocery store.
> Why do we have to have a flag flown in the city property to be
> represented?  You already represented.  We already know who you are,
> and we don't have any hate or any discrimination against that.  We get
> along very well.  By making this bigotry, making this scene, it's making
> like you wanted to hate us.  It's you versus and others.  It's not that.  It's
> everyone included.  And this is the community we live.  I love where
> you live.  I have no problems.  But the community as a whole has this
> respect that we are raising family.  We're doing our best to support the
> community.
>
> Therefore, you are not unwelcome.  You are welcome here.  <u>But we
> have to respect the religions.  We have to respect the people around
> here.  Schools, mosques, churches.</u>  I won't take any longer than this.
> It's been a long night.  But I welcome every one of you.
> (Emphasis added.)

None of the other Councilmen said anything indicating that they disagreed

with Councilman Choudhury's invocation of religion as a basis for approving the

Resolution.  Their silence represented assent.  *See Everett v. Everett,* 319 Mich. 475,

481 (Mich. 1947) (silence clearly indicated approval).    The Council voted

unanimously to approve the Resolution.  (Exhibit 5, pp. 78-79)

On July 9, 2023, Gordon and Stackpoole raised the Pride Flag on one of the flagpoles on Joseph Campau Ave.  Councilman Hassan appeared soon thereafter, contacted the City manager, and demanded that the Pride Flag be removed.  The City manager arrived with the police, and the police removed the Pride Flag.

On July 11, 2023, the City Council passed Resolution 2023-99, titled "Resolution Removing Russ Gordon And Cathy Stackpoole From Human Relations Commission."  (Copy attached as Exhibit 6.)  The Resolution was unanimously approved.   A video recording of the proceeding may be seen at https://www.youtube.com/watch?v=izxF600qzuo   (A transcript of the complete proceeding is attached as Exhibit 7.)

The Resolution stated:

**WHEREAS**, on July 9th, 2023, two members o the Human Relations Commission, Russ Gordon and Cathy Stackpoole, did intentionally violate the laws of the City of Hamtramck by flying a flag in contravention of Resolution 2023-82; and

**WHEREAS**, in order to maintain the respect and dignity of the rule of law, the City must act to remove Russ Gordon and Cathy Stackpoole from the Human Relations Commission.

**NOW, THEREFORE BE IT RESOLVED** by the City Council of the City of Hamtramck, Wayne County, Michigan, that Russ Gordon and Cathy Stackpoole be immediately removed from their membership on the board of the Human Relations Commission to be replaced by candidates appointed by the Mayor and confirmed by the City Council at a later date.

On July 11, 2023, the City Council unanimously passed Resolution 2023-100, titled "Resolution To Rescind Authority Of Human Relations Commission To Maintain And Fly Flags On City Property." (Copy attached as Exhibit 8.) The Resolution stated, in relevant part:

> **WHEREAS**, on July 9th, 2023, members of the Human Relations Commission did willfully and blatantly violate the laws of the City of Hamtramck by flying a flag in contravention of the law designating that no flags of any religion, ethnic, racial, political, or sexual orientation group may be flown inf City property, and
>
> **WHEREAS**, in order to maintain the respect and dignity of the rule of law, the City must act to remove Russ Gordon and Cathy Stackpoole from the Human Relations Commission.
>
> **NOW, THEREFORE BE IT RESOLVED** by the City Council of the City of Hamtramck, Wayne County, Michigan, that the Human Relations Commission of the City of Hamtramck be hereby and henceforth stripped of their authority and control over any and all flag poles on City property and that the City of Hamtramck shall henceforth hold dominion, authority and control over such flagpoles as the sole authority determining compliance under the laws of the City of Hamtramck and State of Michigan.

Plaintiffs filed the instant lawsuit on November 6, 2023, and filed their First Amended Complaint by right on November 17, 2023, and thereafter filed their Second Amended Complaint ("SAC") by leave of court. Plaintiffs have taken the following depositions bearing on the instant motion: deposition of City Manager Maxwell Garbarino (attached as Exhibit 9); deposition of former mayor Karen Majewski (attached as Exhibit 10); deposition of Mayor Ghalib (attached as Exhibit 11); deposition of Russ Gordon (attached as Exhibit 12); depositions of the six City

Council members (Exhibits 13-18).

At Mr. Garbarino's deposition, Plaintiffs' counsel asked him to identify his affidavit. (Exhibit 19; Exhibit 9, pp. 18-26)  Garbarino admitted that he had no personal knowledge regarding his assertion in ¶3 of his affidavit that, "The previous Mayor and city managers over the years generally approved or acquiesced in the flags being flown as long as they were generally accepted in the community." (Exhibit 9, pp. 44-47) He claimed, rather, that the assertion was based on his "impression," not personal knowledge.  (*Id.*, pp. 46-49)  Garbarino continued to be evasive regarding the basis for his claim in his affidavit that Resolution 2023-82, which was passed on June 13, 2023, was "in keeping with the City of Hamtramck's history of monitoring and occasional intervention of the flag poles." (*Id.,* pp. 59-61) Contrary to his affidavit, Garbarino had no personal knowledge regarding what the policy was prior to June 13, 2023, with respect to what flags would be displayed on the flagpoles on Joseph Campau Ave., and how and by whom the decisions were made regarding what flags to display.

Karen Majewski was the mayor of Hamtramck prior to Amer Ghalib. She testified that in 2012, the City's Human Relations Commission requested authority from the City Council to repair and maintain the flagpoles on Joseph Campau Ave., and to fly flags from it.  (Exhibit 10, p. 6) The City Council granted the Commission the authority it requested by passing a Resolution in 2013.  (Exhibit 1)  Regarding

the scope of the authority which the Resolution granted to the Commission, Majewski testified (*Id.,* p. 7):

> My understanding was that the Human Relations Commission would manage the flags and the flag poles. And we didn't have to worry. The rest of the city didn't have to worry about it. The rest of the City Council, or Mayor, or whatever, we didn't have to worry about it. It was under the authority of the Human Relations Commission. And I was grateful for it.

Majewski testified that Russ Gordon was the Chair of the Commission at the time. (*Id.,* p. 8) She testified further: "The Commission did not have to request approval from the Mayor or from Council on what flags would be flown. And they never did." Regarding Mr. Garbarino, she testified that during the time periods that he was officially affiliated with the City as police chief or assistant city manager during her tenure, he had "absolutely no role" in deciding what flags would be displayed on the flagpoles. (*Id.*, pp. 9-10) During this time period, the Commission had total authority to decide what flags would be displayed on the flagpoles, without any input from either the Mayor or the City Council. (*Id.*, p. 10)

Majewski was shown Garbarino's affidavit and was asked to comment on it. She did not agree with what Garbarino stated in ¶3 of his affidavit. (*Id.*, pp. 11-13) She testified that the City Council may only act under Michigan's Open Meeting Act as an official body at a public meeting. Whether to display this or that flag was never discussed at a public meeting. (*Id.,* p. 13) Approval or disapproval could not have been made by a City Council member in private. (*Id.*) She testified, p. 14: "The

City of Hamtramck, once again, never intervened in any way in the flags that were being displayed by the Commission."   Regarding Garbarino's assertion in his affidavit that he had communicated privately with members of the City Council regarding what flags to display, she testified (p. 15):  "So I find that statement very unlikely.   And certainly, it never happened in any kind of official capacity." Regarding an issue which had arisen regarding displaying the Serbian flag, she testified that the decision whether to display the Serbian flag would have been made solely by the Commission, without any input by the Mayor or City Council. Regarding ¶4 of Garbarino's affidavit, she denied that the City had a "history of monitoring and official intervention of the flag poles" which was affirmed by Resolution 2023-82.  (*Id.*, pp. 16-17).

Mayor Ghalib identified his affidavit (Exhibit 20), in which he attested:  "On more than one occasion, prior to the enactment of the resolution clarifying the flags permissible to be flown on city flagpoles, myself and other members of city council have denied various residents of the City of Hamtramck who requested their flags of choice be flown on city flagpoles by the Hamtramck Human Relations Commission."  At his deposition, Mayor Ghalib acknowledged that this occurred <u>after</u> he was elected mayor in January, 2022.  (Exhibit 11, p. 14)  As Majewski testified, however, the Human Relations Commission was in charge of the flag display program during her administration, before Mayor Ghalib was elected.

10

Ghalib testified that homosexuality is considered sinful in the Islam religion, as in all religions. (*Id.,* pp. 51-52)

Russ Gordon testified that he was appointed to the Hamtramck Human Relations Commission by Mayor Majewski based on his civic work on behalf of the City and served as Chairperson of the Commission. (Exhibit 12, pp. 14-15). The purpose of the Commission "is to, in many aspects, further the interests of Citizens of Hamtramck." (*Id.,* p. 15) The Commission's purpose was to "raise flags to represent different people in Hamtramck." (*Id.,* p. 16) He testified that in 2013, the Commission persuaded the City Council to pass a Resolution authorizing the Commission to repair the flagpoles on Joseph Campau Ave., to purchase flags to be displayed on the flagpoles, and to solicit funds to defray the costs. (*Id.*, pp. 16-17) He testified that no restrictions were placed on the Commission regarding what flags to display, until recently. (*Id.,* p. 17) There were 18 flagpoles on Joseph Campau Ave. The first year after the Resolution was passed, they used the census tract to determine the nationalities of people living in Hamtramck. They learned there was a sizeable Ethiopian segment in the Hamtramck population, so they raised the Ethiopian flag. (*Id..* p. 18) They displayed the U.S flag from two flagpoles. They decided not to allow politicians do get involved in the decision-making. Gordon testified (*Id.*, p. 19):

Gordon raised the flags himself, starting on Memorial Day, and removing

them after Labor Day.  (*Id.,* p. 20)  After the first year, flags were displayed based on the requests made by citizens of Hamtramck.  (*Id.,* p. 21)  In response to such requests, they displayed the flags of Bosnia, Yemen, Bangladesh, Poland.  The City never made any financial contributions to the purchase costs of the flags.  (*Id.*)  The money was raised from businesses on Joseph Campau Ave.  In exchange for contributions, plaques were attached to the flagpoles identifying the businesses which made contributions.  (*Id.*, pp. 22-23)  Gordon used his own ladder and tools to display the flags.  The City paid for nothing.  (*Id.,* pp. 23-24)

At the request of one of the Hamtramck residents, the Commission displayed the flag of Sicily, which is not a country.  (*Id.,* pp. 26-28)  Gordon then identified a spreadsheet which he had prepared which identified the flags which were displayed representing the countries from which Hamtramck's residents emigrated, and what years they were displayed during.  (*Id.,* p. 29) (Exhibit 21)  They decided to display the African Union flag, and also displayed the Cherokee Nation flag.  (Exhibit 12*, pp. 30-31; 55)  The Commission decided on only one occasion to refuse to display a flag.  It was the Serbian flag.  They decided not to display the flag in order to avoid causing dissension between the Bosnian and Serbian residents.  (*Id.*, pp. 31-34).

Gordon was shown Giordano's affidavit and was asked to comment on its contents.  He disagreed with Giordano's assertion that the Commission did not have total authority to decide what flags to display.  Regarding the resolution giving the

Commission authority over the flagpoles, he testified (*Id.*, p. 35): "It gave us the authority.  And it doesn't, in the resolution, say total authority, but it didn't say that it's compromised in any way either.  We took that resolution and we ran with it.  And we did a job and we did a damn good job."  He also disagreed with Garbarino's assertion in his affidavit that, "The previous city managers, generally, approved or acquiesced in the flags being flown."  "They were – none of them ever knew when we were putting up or taking down a flag, so they had no way to acquiesce or approve."  (*Id.*, p. 36)  He testified that Garbarino's assertion in ¶3 of his affidavit that, "the City intervened and prevented the Commission from flying the flag of Serbia while an ongoing conflict was occurring in the region," was absolutely false.  (*Id.*, p. 38)  He also disagreed with Garbarino's representation in ¶4 of his affidavit that the City had a history of monitoring what flags would be displayed.  (*Id.*, p. 39).

Gordon testified that in 2021 the then City manager, Kathy Angerer, contacted him and asked him if there was a flag pole available from which the Pride Flag could be displayed.  (*Id.*, pp. 40-41)[1]  He responded that there was.  Angerer told him that the Chair of the Arts and Culture Committee wanted to display the Pride Flag.  He ordered the Pride Flag, but by the time the Pride Flag arrived in 2021, it was too late

---

[1] The Pride Flag and its various versions are intended to represent the LGBTQ community and celebrate progress, advocate for representation, and amplify the demand and drive for collective action.
https://outrightinternational.org/insights/flags-lgbtiq-community

in the year to display it.  (*Id.,* pp. 43-44)  He raised the Pride Flag in the Spring of the following year, 2022.  Angerer called him and told him that there was a City Council member, and the newly elected Mayor, Amer Ghalib, who wanted the Pride Flag removed.  Gordon refused.  (*Id.,* p. 48)  He was still operating under the resolution which had given the authority to the Commission to decide what flags to display.  (*Id.,* p. 49) The Pride Flag was displayed to recognize Hamtramck's significant gay community.  (*Id.,* 52-53)

He disagreed with the passage of Resolution 2023-82, testifying (*id.*, pp. 56-57):

> A      Because they wanted to pull the pride flag down.  And that was the only reason behind it.
> You know, in all these years, all the flags we put up, nobody has had any issue with any one of them, African Union, Ethiopian, the – none of them that were not the POW/MIA flag.  All of the flags that were not – that didn't represent a discrete nation, nobody had a problem with any flag until the pride flag went up.
> I mean, it's – if you ask anybody on the street why did the pride flag come down, they'll tell you.
>
> Q      What do you think they'll say?
>
> A      It offended religious people.
> And I got to tell you – I mean, I'm sure it offended lots of Catholic people.
>
> Q      Do you believe that?
>
> A      Huh? Believe that that's the reason?
>
> Q      Yes

A      Oh, absolutely, a hundred percent.  I got no doubt in my mind, none.

Why did – when – why later when the pride flag went up after that did they pull down African Union and the other flags that were not national flags?  They passed a resolution.  But, you know, the pride flag hadn't gone up, they wouldn't have touched any of them.

Gordon rejected the explanation that the purpose of the Resolution was to preserve neutrality.  "No. Absolutely, that's bullshit."  (Exhibit 12, p. 58) After the Resolution was passed, he and co-Plaintiff Catrina Stackpoole raised all of the flags, including the Pride Flag, the African Union flag, and the Cherokee Nation flag.  He was notified by Garbarino that those three flags had been removed.  (*Id.*)

## STANDARD OF REVIEW

The standard of review of a motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 was set forth in *Ferro Corp. v. Cookson Group,* 585 F.3d 946 (6th Cir. 2009), as follows, *id.,* at 949:

> Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." … In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. … The movant therefore has the burden of establishing that there is no genuine issue of material fact. But the non-moving party "may not rely merely on allegations or denials in its own pleading." … The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts."
> (Citations omitted.)

## **ARGUMENT**

I.    **RESOLUTION 2023-82 VIOLATED THE FREE SPEECH CLAUSE AND/OR THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT, REGARDLESS WHETHER THE FLAGPOLES ON JOSEPH CAMPAU AVE. QUALIFY AS A PUBLIC FORUM, A LIMITED PUBLIC FORUM, OR A NONPUBLIC FORUM.**

42 U.S.C. § 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

The Defendants were acting under color of law when they enacted Resolution 2023-82. Municipalities qualify as persons under 42 U.S.C. § 1983. *Monell v. New York City Dept't of Soc. Servs.,* 436 U.S. 658 (1978).

The free speech provision of the 1st Amendment of the United States Constitution applies to the states pursuant to the 14th Amendment. *New York Times v. Sullivan,* 376 U.S. 254, 266 (1964); *Zinermon v. Burch,* 494 U.S. 113, 125 (1990). The Establishment Clause likewise applies to the states via the 14th Amendment. *Everson v. Board of Education,* 330 U.S. 1 (1947)

"In balancing the government's interest in limiting the use of its property for expressive activity, the Court has identified three types of fora: the traditional public forum, the limited public forum created by government designation, and the

nonpublic forum. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45-46 (1983).  The proper First Amendment analysis differs depending on whether the area in question falls in one category rather than another."  *Board of Airport Commissioners v. Jews for Jesus, Inc.,* 482 U.S. 569, 572(1987); *see also Minn. Voters All. v. Mansky,* 138 S. Ct. 1876, 1885 (2018) (same).

### A.     The Flagpoles Qualified As A Public Forum And The Resolution Violated The Freedom Of Speech Clause Because It Was Not Content And Viewpoint Neutral.

A governmental action, including a statute, an ordinance, resolution, or policy, which regulates speech in a public forum may only do so if it is both content and viewpoint neutral.  It is unconstitutional for government to select what speech will be permitted, and what speech will be prohibited, based on the content or viewpoint of the message conveyed by the speech.  As the Court stated in *Rosenberger v. Rector & Visitors of University of Virginia,* 515 U.S. 819, 829 (1995):

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.  See *R.A.V. v. St. Paul,* 505 U.S. 377, 391 (1992).  Viewpoint discrimination is thus an egregious form of content discrimination.  The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. …
> (Citation omitted.)

*See also  Reed v. Town of Gilbert,* 576 U.S. 155 (2015) (the sign ordinance enacted by the City of Gilbert, Arizona, violated the Free Speech provision of the First Amendment because, while it prohibited the display of outdoor signs, it exempted

23 categories of signs based on their content); *Shurtleff v. City of Boston, Mass.,* 42 S. Ct. 1583 (2022) (City of Boston violated the Free Speech provision of the First Amendment by rejecting the request of a Christian organization to display a Christian flag from the flagpole in front of the Boston City Hall, when the City allowed the display of flags requested by other private groups); *Cleveland Area Board of Realtors v. City of Euclid,* 88 F.3d 382 (6th Cir. 1996) (City's ordinance regulating the size, number, and placement of signs in residential neighborhoods unconstitutional because it was not content neutral).

In *Shurtleff, supra,* the City of Boston allowed residents to fly a flag of their choosing from the flagpole in front of the Boston City Hall.  Setting the background of the lawsuit, the Court stated, 142 S. Ct. at 1587:

> For years, Boston has allowed private groups to request use of the flagpole to raise flags of their choosing.  As part of this program, Boston approved hundreds of requests to raise dozens of different flags.  The city did not deny a single request to raise a flag until, in 2027, Harold Shurtleff, the director of a group called Camp Constitution, asked to fly a Christian flag.  Boston refused.  At that time, Boston admits, it had no written policy limiting use of the flagpole based on the content of a flag.  The parties dispute whether, on these facts, Boston reserved the pole to fly flags that communicate governmental messages, or instead opened the flagpole for citizens to express their own views.  If the former, Boston is free to choose the flags its flies without the constraints of the First Amendment's Free Speech Clause.  If the latter, the Free Speech Clause prevents Boston from refusing a flag based on its viewpoint.

> The issue came down to the question of whether the flagpole in front of the

City Hall was being used for government speech, i.e., was a nonpublic forum, in

which case Boston could refuse to fly the Christian flag, or whether its use over the

years had made it a public forum, which precluded Boston from refusing to fly the

Christian flag based on its viewpoint.  To resolve this issue, the Court engaged in a

lengthy analysis of how the flagpole had been utilized over the years, *id.* at 1592:

> To be sure, Boston maintained control over an event's date and time to
> avoid conflicts.   It maintained control over the plaza's physical
> premises, presumably to avoid chaos.  And it provided a hand crank so
> that groups could rig and raise their chosen flags.  But it is Boston's
> control over the flags' content and meaning that here is key; that type
> of control would indicate that Boston meant to convey the flags'
> messages.
>
> On this issue, Boston's record it thin.  Boston says that all (or at least
> most) of the 50 flags I approved reflect particular city-approved values
> or views.   Flying flags associated with other countries celebrated
> Bostonians' many different national origins; flying other flags, Boston
> adds, was not "wholly unconnected" from a diversity message or "some
> other day or cause the City or Commonwealth had already endorsed."
> ….   That may well be true of the Pride Flag raised annually to
> commemorate Boston Pride Week.  …  But it is more difficult to
> discern a connection to the city as to, say, the Metro Credit Union flag
> raising, a ceremony by a local community bank.
>
> In any event, we do not settle this dispute by counting noses-or, rather,
> counting flags.  That is so for several reasons.  For one thing, Boston
> told the public that it sought "to accommodate all applicants" who
> wished to hold events at Boston's "public forum ," including on City
> Hall Plaza.  …  The application form asked only the contact information
> and a brief description of the event, with proposed dates and times.  The
> city employee who handled applications testified by deposition that he
> had previously "never requested to review a flag or requested changes
> to a flag in connection with approval"; nor did he even see flags before
> the events. … The city's practice was to approve flag raisings, without
> exception.  It has no record of denying a request until Shurtleff's.
> Boston acknowledges it "hadn't spent a lot of time really thinking
> about" its flag-raising practices until this case. … True to its word, the

city had nothing-no written policies or clear internal guidance-about what flags groups could fly and what those flags would communicate.

Considering the factors identified in the above analysis, the Court concluded that the flagpole in front of the Boston City Hall was not confined to government speech and therefore constituted a public forum. Consequently, the city's refusal to display the Christian flag was based on its viewpoint and therefor violated the First Amendment. Applying the factors considered by the Court in *Shurtleff* to the instant lawsuit indicates that the history of how flags have been displayed on the flagpoles on Joseph Campau Ave. supports the conclusion that the flagpoles have not been used for government speech, but rather have been used as a public forum. Gordon and Majewski testified that prior to 2023, the decisions regarding what flags to display on Campau Ave. were made exclusively by the Human Rights Commission. The Commission accordingly displayed a flag honoring the Cherokee people, some of whom resided in Hamtramck. They displayed a flag honoring the African-American residents of Hamtramck. The flags of countries from which residents had emigrated to the United States were displayed, including a Sicilian flag, although Sicily is an island, not an independent nation. The Pride flag was displayed in 2022, at the request of the Chairperson of the Hamtramck Arts and Culture Commission. The chart identified at Gordon's deposition demonstrates the variety and frequency with which the various flags were displayed. Moreover, unlike in Boston, where the city provided the hand crank to raise the flags, Gordon used his own ladder to raise

the flags on the flagpoles.  In addition, no Hamtramck funds were used to buy the flags.  The flags were purchased using contributions from the various businesses in Hamtramck.

Based on the factors identified in *Shurtleff* which qualify a flagpole as a public forum, the testimony of Gordon and Majewski demonstrate that the flagpoles on Joseph Campau Ave. constitute a public forum, and therefore it is impermissible under the First Amendment to decide what flags will be displayed based on their content or viewpoint.  Hamtramck's Resolution 2023-82, however, is not content and viewpoint neutral, because it permits the display of the Prisoner Of War flag and nations' flags which represent the international character of the City, but prohibits displaying all other flags which convey a different message.[2]  The Resolution therefore violates the Freedom of Speech provision of the First Amendment and is unconstitutional.  Because the Resolution bears on the fundamental right of free

---

[2] On August 10, 1990, the 101st Congress passed US Public Law 101-355, which recognized the National League's POW/MIA flag and designated it, "the symbol of our Nation's concern and commitment to resolving as fully as possible the fates of Americans still prisoner, missing and unaccounted for in Southeast Asia, thus ending the uncertainty for their families." While some Council members claimed they did not know what the Prisoner of War Flag represented (*see, e.g.,* the deposition of Councilman Refai, Exhibit 14, p. 73; deposition of Councilman Hassan, Exhibit 18, p.  ), Councilman Alsomiri acknowledged that he voted for the Resolution because the POW flag was not the "gay flag" (Exhibit 13, p. 118), and Councilman Musa testified that he knew that the POW flag represented American military service personnel who had been captured during war, and he preferred that flag over the Pride Flag (Exhibit 17, p. 112).

speech, it may only be approved if it survives strict scrutiny.  *See Clark v. Jeter,* 486 U.S. 456, 461 (1988); *Butterworth v. Smith,* 494 U.S 624, 629 (1990).   The Resolution does not survive strict scrutiny, because its distinctions based on content and viewpoint are not justified by a constitutional compelling state interest.

The Court should accordingly grant Plaintiffs' motion for summary judgment with respect to Count I of the SAC, enter a declaratory judgment indicating that Resolution 2023-82 is unconstitutional, order that it be rescinded, and that the Pride Flag, and the other flags which accompanied it, be re-displayed on the flagpoles on Joseph Campau Ave.

### B.   The Resolution Violated The Free Speech Provisions Even If The Flagpoles Qualify As A Limited Public Forum.

When government opens its property for designated purposes, it is regarded as a limited public forum.  *Lamb's Chapel v. Center Moriches Sch. Dist.,* 508 U.S. 384 (1993).  Regarding the parameters which apply to a limited public forum, the Court stated in *Good News Club v. Milford Central School,* 533 U.S. 98, 106 (2001):

> When the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech.  The State may be justified "in reserving [its forum] for certain groups or for the discussion of certain topics." … The State's power to restrict speech, however, is not without limits.  The restriction must not discriminate against speech on the basis of viewpoint. … [A]nd the restriction must be "reasonable in light of the purpose served by the forum[.]" …
> (Citations omitted.)

*See also Widmar v. Vincent,* 454 U.S. 263 (1981).

In *Gay Lesbian Bisexual Alliance v. Pryor,* 110 F.3d 1543 (11th Cir. 1997), the Court held that an Alabama statute which prohibited the use of student fees by the Gay Bisexual Alliance at the University of South Alabama, and which denied on-campus banking privileges to the Alliance, violated the First Amendment, stating, *id.* at 1549:

> [W]hen a university makes funds available to encourage student expression, the university creates a limited public forum.
>
> Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set. The state may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint.

Even if the flagpoles on Campau Ave. qualify as a limited public forum, rather than as a public forum, the boundaries of the limited public forum and its purpose was established by the Commission prior to 2023. The City could not modify those boundaries by passing a Resolution in 2023 which altered those boundaries based on the viewpoint of the message being conveyed by the flags displayed on the flagpoles. Gordon testified that the flags which the Commission decided to display were intended to represent the City's diversity, which included the gay community. Barring the display of the Pride Flag was therefore not reasonable in light of the purpose which the Commission had established for the flagpoles. The Resolution accordingly violated the First Amendment.

**C.  Even If The Flagpoles Constitute A Nonpublic Forum, The Resolution Violated The First Amendment.**

In the case of government speech in a nonpublic forum, "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum <u>and are viewpoint neutral</u>." *Cornelius v. NAACP Legal Defense Ed. Fund,* 473 U.S. 788, 806 (1985) (Emphasis added). *See also United States v. Kokinda,* 497 U.S. 720, 730 (1990) (entrance to a U.S. Post Office) (same); *Arkansas Ed. Television Comm'n v. Forbes,* 523 U.S. 666, 677 (1998) (state-owned public television broadcaster) (same). Consequently, for the same reason that the Resolution violated the First Amendment if the flagpoles qualified as a public or limited public forum, its lack of viewpoint neutrality violated the First Amendment even if the flagpoles constituted a nonpublic forum.

In addition, the First Amendment's Establishment Clause prohibits any governmental entity from enacting any statute, ordinance, resolution or policy in order to accommodate the religious beliefs of government officials or of the government entity's citizenry. Therefore, government speech, and government action generally, may not violate the Establishment Clause. *See Pleasant Grove v. Summum,* 555 U.S. 460, 468 (2009) ("[G]overnment speech must comport with the Establishment Clause."); *Larson v. Valente,* 456 U.S. 228 (1982) (Minnesota statute which exempted certain religious denominations from reporting requirements, but

not others, violated the Establishment Clause); *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116 (1982) (Massachusetts statute which authorized the governing bodies of churches to prevent issuance of liquor licenses within a 500-foot radius of a church violated the Establishment Clause); *Board of Ed. of Kiryas Joel v. Grumet,* 512 U.S. 687 (1994) (government should not prefer one religion to another, or religion to irreligion); *Santa Fe Independent School District v. Doe,* 530 U.S. 290 (2000) (School District's policy of permitting student-led and initiated prayer at football games violated the Establishment Clause); *American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook,* 375 F.3d 484 (6th Cir. 2004) (Judge's insistence on displaying Ten Commandments in his courtroom violated the Establishment Clause).[3]

---

[3] What is the explanation for what appears to be an inconsistency between the decisions in *Shurtleff* and *Pleasant Grove*?  In *Shurtleff,* the Court concluded that the flagpole in front of the Boston City Hall constituted a public forum, which required that the City's decisions regarding what messages could be conveyed on the flagpole had to be content and viewpoint neutral, even if the message was a religious message that appeared to violate the Establishment Clause.  In *Pleasant Grove,* the Court concluded that although the park was a public forum, the monuments in the park constituted government speech, which the government had complete autonomy over in deciding the messages which the monuments conveyed and was not limited by the neutrality doctrine, with the exception that the message could not violate the Establishment Clause.  Why then, was it permissible for Pleasant Grove to include a Ten Commandments monument, but reject a monument containing the Seven Aphorisms of Summa?   Because the plaintiffs in *Summa* based their lawsuit exclusively on the Free Speech Clause of the First Amendment.  They did not raise an Establishment Clause objection to the display of the Ten Commandments, while rejecting a display of the Seven Aphorisms of Sumna.  In the instant case, even if the flagpoles on Joseph Campau Ave. constitute a non-public forum, display of the

The evidence indicates that a primary motivating factor in the City Council's passage of Resolution 2023-82 was in order to accommodate a segment of the Hamtramck community which was hostile to the rights of the gay community based on their personal religious views.  Councilman Alsomiri indicated in his Answer to Plaintiffs' First Interrogatories (copy attached as Exhibit 21): "I spoke with numerous members of the community who approached me regarding the pride flag. I don't recall their names, but I recall some of the conversation I had.  The substance of those conversations was that the community was against the flying of the pride flag.  I respect my community.  They vote for me.  So I listened to their concerns."[4] He  testified at his deposition that he voted in favor of the Resolution because people

---

Pride Flag does not violate the Establishment Clause, whereas the City's refusal to display the Pride Flag based on the religious beliefs of the City Council members and/or the religious beliefs of some residents of the City does violate the Establishment Clause.   Plaintiffs have raised both Freedom of Speech and Establishment Clause objections to the City's decision.

[4] In response to the question regarding whether he had had any conversations with any residents of Hamtramck regarding "intimate or sexual relations between members of the same gender," Alsomiri responded (Exhibit 23, p. 7): "Conversations regarding intimacy between partners behind closed doors is not something that polite members of my community discuss.  As such, I have not had communications regarding the intimate or sexual relations of members of the same gender with anyone since the pride flag issue arose."  Curiously, Mayor Ghalib and Councilmen Mahmood, Musa, Refai, and Hassan gave the exact same answer, which they signed and had notarized under oath.  Hassan testified that he in fact wrote his answer in his own words, claimed that he did not discuss his answer with any of the other Council members, but could not explain the extraordinary coincidence that they all gave the same exact answer, using the same words.  (Exhibit 18, pp. 73-81)

he spoke to in the community told him that "gay is bad."  (Exhibit 13, pp. 100-102)

He testified that he has to respect the people who vote for him.  (*Id.*, pp. 108, 128,

132).  He testified that he regarded the 1,300 Hamtramck residents who voted for

him as his community.  (Exhibit 13, pp. 128, 134)  He voted for the Resolution

because it prohibited display of the "gay" flag.  (*Id.,* p. 120) In so doing, he

necessarily voted in favor of the Resolution in order to accommodate the religious

views of some segment of the Hamtramck community, because as a matter of

demographic statistics, some percentage of Hamtramck's citizens are opposed to gay

rights based on their personal religious views, regardless what religious

denomination they adhere to.  (*See* Affidavit and report of Plaintiffs' expert, Prof.

Andrew Flores, attached as Exhibit 24.)  The fact that the precise number of people

in Hamtramck who are opposed to gay rights based on their personal religious views

is unknown is irrelevant.  What is relevant is that the percentage is unequivocally

greater than 0%, and that Alsomiri testified that he rendered his vote in favor of the

Resolution in order to accommodate the people who wanted him to vote against the

"gay flag," which necessarily statistically included some individuals who were

opposed to the "gay flag" based on their religious views.  In so voting, Alsomiri

voted to accommodate the religious views of some residents of Hamtramck, and

thereby violated the Establishment Clause.  (Exhibit 24, ¶s 10, 16)

Councilman Refai. while asserting that he is a devout Muslim, was repeatedly

evasive regarding whether homosexuality is considered a sin in Islam, and refused to answer relevant questions put to him.  (Exhibit 14, pp. 15-30)  When a witness is evasive, refuses to answer questions, or is uncooperative, the court is entitled to draw an adverse inference, in this case that Refai considered homosexuality to be a sin under Islam, and was thereby influenced to vote in favor of the Resolution.  *See Deacero S.A.P.I. de C.V. v. United States,* 996 F.3d 1283, 1298 (Fed. Cir. 2021); *Mukand, Ltd. v. United States,* 767 F.3d 1300, 1306 (Fed. Cir. 2014); *Kaur v. Holder,* 574 App'x 76 (9th Cir. 2014); *Xin Qiu Lin v. Gonzales,* 231 App'x 94, 97 (2d Cir. 2007); *International Union,* 459 F.2d 1329, 1336 (D.C. Cir 1972).  After much teeth-pulling, he finally acknowledged that homosexuality is regarded as a sin in Islam, but embedded the admission in repeatedly stating that it is considered a sin in all religions.  (Exhibit 14, p. 26)  His insistence that it is a sin in all religions, underscores that his vote in favor of the Resolution was based on religious considerations.

Under Fed. R. Ev. 201, moreover, a court may take judicial notice of facts set forth in treatises and authoritative publications.  *See, e.g., Flood v. Kuhn,* 407 U.S. 258, 261-263 (1972) (taking judicial notice of facts set forth in treatises and publications regarding the history of baseball); *Oneida Indian Nation of N.Y. v. State of N.Y.,* 691 F.2d 1070, 1086 (2d Cir. 1982) ("When there is no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts,

or factual matters that are incontrovertible, such notice is admissible."); *Hotel Employees & Restaurant Employees Union, Local 100 v. City of New York Department of Parks & Recreation,* 311 F.3d 534, 540, note 1 (2d Cir. 2002) (taking judicial notice of facts regarding the history of the construction of Lincoln Center contained in a treatise). At Councilman Choudhury's deposition, Plaintiffs offered and had marked as exhibits excerpts from texts about Islam and from two copies of the Quran. *See* excerpt from Esposito, What Everyone Needs To Know About Islam, Oxford University Press (2nd Ed. 2011) (attached as Exhibit 25) stating, p. 173: "In Islam (as in the majority opinion of all the world's religions) homosexuality is prohibited. In some areas it is treated as a crime punishable under Islamic law, while in others homosexuality is tolerated but homosexuals are still set apart socially." Rehman and Polymenopoulou, Is Green a Part of the Rainbow's *Sharia*, Homosexuality and LGBT Rights in the Muslim World, 37 Fordham International Law Journal 1 (2013) (copy attached as Exhibit 26), wherein the authors state at p. 22: "Islamic scholars have based their arguments for the prohibition on homosexuality mostly on *ahadith* with several states using them officially to impose tortuous punishments against LGBT persons." The Quran contains two Suras prohibiting sexual relations between men, Sura 4:16 and Sura 26:165-175. *See* excerpts from the The Meaning of The Glorious Qur'an, translated by Abdullah Yusuf Ali (copy attached as Exhibit 27) and The Quran The Eternal Revelation

vouchsafed to Muhammad The Seal of the Prophets (1991), translated by Muhammad Zafrulla Khan (copy attached as Exhibit 28).

In his Answer to Plaintiff's First Interrogatories (Exhibit 23, p. 6), Refai stated: "I spoke with numerous members of the community who approached me regarding the pride flag.  I don't recall their names, but I recall some of the conversations I had.  The substance of those conversations was that the community was against flying of the pride flag."  At his deposition, Refai stated that the "community" he was referring to was the residents of Hamtramck.  (Exhibit 14, p. 38)  Prof. Flores attests in his Affidavit that survey research data indicate that in a sample the size of all of the residents of Hamtramck, several of the residents opposed to the Pride Flag would have been opposed based on their religious beliefs.  (Exhibit 24, ¶s 11, 17).  These opinions based on religious views consequently played a role in influencing Refai to vote in favor of the Resolution, thereby violating the Establishment Clause.

Councilman Choudhury expressly stated that the Resolution should be approved in order to respect residents' religious views.  (Exhibit 5, p. 73)[5]  Not a single Councilman expressed disagreement with this rationale, thereby indicating

---

[5] At a forum for candidates for City Council held on October 8, 2023, Councilman Choudhury explained why he had voted for the Resolution, reiterating that he supported the Resolution on religious grounds.  (*See* Defendants' Response to Plaintiffs' Third Request For Admissions, attached as Exhibit 22.)

their assent.  *See Everett v. Everett,* 319 Mich. 475, 481 (Mich. 1947) (silence clearly indicated approval); *U.S. v. Skidmore,* 998 F.2d 372, 376 (6th Cir. 1993) ("The court chose, however, not to express the status of the plea agreement, and we must construe this silence as acceptance of the agreement."); *Cone v. Bell,* 243 F.3d 961, 979 (6th Cir. 2001) ("We can only imagine the effect on the jurors when Cone's defense counsel refused even to ask them to spare his client's life.  They could only have inferred that Cone's counsel was, by his silence, acquiescing to the prosecutor's plea that Cone be sentenced to death.")

During Choudhury's deposition, he watched the video recording of the hearing on June 13, 2023, and, in conjunction with the attorneys at the deposition, counted how many of the individuals who spoke at the public hearing were residents of Hamtramck, and spoke in favor of, and opposed to, the Resolution.  (Exhibit 15, pp. 98-174)  The final count indicated that 18 residents stated they were opposed to the Resolution, while 11 residents stated they supported the Resolution. (*Id.,* pp. 175-176)   So, the majority of the attendees who were residents of Hamtramck (62%) opposed the Resolution, yet the six City Council members voted unanimously in favor of the Resolution.  This was not an example of democracy in action.  The fact that they were willing to ignore what the majority of the resident attendees wanted, supports the inference that they were motivated to vote for the Resolution based on religious grounds, in violation of the Establishment Clause.  In fact, five of the

Hamtramck residents who spoke at the hearing on June 13, 2023, expressly stated that they supported the Resolution, and were opposed to displaying the Pride Flag on Joseph Campau Ave., because the Pride Flag endorsed a life-style that was contrary to the strictures of Islam.  (Exhibit 5, pp. 23, 30, 32, 33)  Prof. Flores attested that the evidence indicates that Council member's Choudhury's vote in favor of the Resolution constituted an endorsement of the religious beliefs of some of the residents of the City.  (Exhibit 24, ¶s 12, 18)

Councilman Mahmood testified that he supported the Resolution in order to bring peace to the community.  (Exhibit 16, pp. 71-72)  But by voting in favor of the Resolution, he supported the minority of the speakers at the hearing who were opposed to displaying the Pride Flag, including four speakers who were opposed to it based on their adherence to Islam, rather than the majority, who were opposed to the Resolution and supported displaying the Pride Flag.  Mahmood thus viewed bringing peace to the community as entailing respecting the religious beliefs of a minority of the speakers at the public hearing.

At his deposition, Council member Musa testified that when he voted in favor of the Resolution, he was supporting what the people of Hamtramck wanted.  (Exhibit 17, pp. 104-106)  Prof. Flores attested that the evidence indicates that Council member Musa's vote in favor of the Resolution constituted

an endorsement of the religious beliefs of some of the residents of the City.  (Exhibit 24, ¶s 13, 19)

At the public hearing on the Resolution, Councilman Hassan emphasized that as an elected government official, it was his duty in a democracy to represent the dominant opinions of his constituents, stating (Exhibit 5, p. 72):  "I am of the people. I am elected by the people, okay?  And I am for the people.  So, what I'm doing … what I'm doing because I'm elected, I am of the people and by the people elected, I'm working for the people."  As Prof. Flores attests in his Affidavit, by so voting, Hassan necessarily voted to accommodate the religious views of some of the residents of Hamtramck.  (Exhibit 24, ¶14)  Moreover, in voting in favor of the Resolution, he in fact ignored the opinions of the 77% of the residents of Hamtramck who offered public statements, including emails, in opposition to the Resolution. He instead voted to support the minority opinion of the 23% of Hamtramck residents who offered opinions in favor of the Resolution, including the five Hamtramck residents who supported the Resolution based on religious grounds.

Hassan testified that when he voted for the Resolution, he was representing the majority of the residents of Hamtramck.[6]   A census of the population of

---

[6] At his deposition, Councilman Hassan was repeatedly evasive, combative, refused to answer some questions, and accused Plaintiffs' counsel of violating his freedom of religion under the First Amendment. (Exhibit 18, pp. 51-52, 110-111)  His evasiveness and refusal to answer some questions entitles the court to draw an

Hamtramck from 2000-2023 was marked as an exhibit (Exhibit 29), and was shown to Hassan (Exhibit 18, pp. 130-134). The population of Hamtramck in 2023 was 27,339. Hassan testified that by voting for the Resolution, he was representing the majority of the residents of Hamtramck in 2023, which would have been more than 13,670 people. Hassan testified that he in fact represented the views of 14,000 residents of Hamtramck (*id.,* p. 134). Prof. Flores attests in his Affidavit, that the demographic data indicates that therefore there were some residents of Hamtramck among those whom Hassan asserted he represented who were opposed to displaying the Pride Flag based on their religious views. In voting for the Resolution, Council member Hassan thereby endorsed the religious views of some of the residents if the City. (Exhibit 24, ¶s 14, 20) Hassan thereby violated the Establishment Clause.

In addition, Gordon testified regarding the various nationalities of Hamtramck's residents and the flags which represented those nationalities. (Exhibit 12, pp. 16, 29-31, 52; Exhibit 24). Alsomiri testified that as a Councilman, he spoke to Armenian, Albanian, Ukrainian, Yemeni, Polish, Bengali and Bosnian residents of Hamtramck, and some of them attended church. (Exhibit 13, pp. 28, 77, 81) Pursuant to Fed. R. Ev. 201, Plaintiffs request that the court take judicial notice that some individuals of these nationalities are adherents of various religions, and are

---

adverse inference regarding his motivation. *Deacero, Mukand, Ltd., Kaur, Xin Qiu, International Union, supra.*

living in Hamtramck.  *See, e.g., Santoso v. Holder,* 580 F.3d 110, 112 (2d Cir. 2009) ("[W]e may take notice of the fact that Indonesia is a nation state consisting of approximately 6000 inhabited islands and that, in many places, Roman Catholicism is predominant.); *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir. 1995) ("We may take judicial notice of the central and fundamental role played by the Sacred Sweat Lodge in many Native American religions.") Consequently, the deposition testimony, Answers to Plaintiffs' First Interrogatories, and statements at the June 13, 2023, public hearing of Choudhury, Alsomiri, Refai, Mahmood and Hassan indicate that when they voted in favor of the Resolution banning display of the Pride Flag from the flagposts on Joseph Campau Ave., they did so based on their intention to represent the desires of the people of Hamtramck, and in so doing were representing and advocating for the religious views of some of the residents of Hamtramck, thereby violating the Establishment Clause.

The evidence thus demonstrates that five of the six City Council members voted in favor of the Resolution based on their personal religious beliefs (Refai. Choudhury) and/or the religious beliefs of some segment of Hamtramck's residents (Alsomiri, Refai, Choudhury, Mahmood and Hassan), thereby violating the Establishment Clause.  This represented a majority of the six City Council members.

Strict scrutiny applies to evaluating whether the violation of the Establishment Clause was justified by a constitutional compelling state interest.  *Larson v. Valente,*

*supra*, 456 U.S. at 246. The Resolution was not justified by a compelling state interest.  The City of Hamtramck has no compelling government interest which justifies precluding displaying the Pride Flag from the City's flagpoles, and preventing its citizenry from seeing the Pride Flag.  The Resolution was therefore clearly unconstitutional because it violated both the Free Speech Clause and the Establishment Clause of the First Amendment.

Consequently, regardless whether the flagpoles constituted a public, limited public, or nonpublic forum, passage of Resolution 2023-82 violated the Frist Amendment. The Court should accordingly grant Plaintiffs' motion for summary judgment with respect to Counts I and II of the SAC, enter a declaratory judgment indicating that Resolution 2023-82 is unconstitutional, order that it be rescinded, and that the Pride Flag, and the other flags which accompanied it, be re-displayed on the flagpoles on Joseph Campau Ave.

## II.   RESOLUTION 2023-82 VIOLATED THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

In enacting a statute, ordinance, or resolution which affects free speech, a government entity may not grant the use of a forum to citizens whose views it finds acceptable, but deny it to citizens wishing to express less favored views.  Exercising such selectivity violates the Equal Protection Clause of the 14th Amendment.  *See Police Dep't of Chicago v. Mosley,* 408 U.S. 92 (1972) (a Chicago ordinance which prohibits picketing near a school, but exempts labor picketing, violates the Equal

Protection clause); *Carey v. Brown,* 447 U.S. 455 (1980) (Illinois statute which prohibits picketing near a residence, but exempts picketing near a place of employment involved in a labor dispute violates the Equal Protection Clause).

Resolution 2023-82 violates the Equal Protection Clause because it favors displaying the Prisoner of War flag, and the flags of nations which are representative of the international character of the City, over all other flags, including the Pride Flag. Because the Resolution affects a fundamental right, freedom of speech, the disparity created by the Resolution must be subject to strict scrutiny and be justified by a constitutional compelling state interest. The disparity created by the Resolution is not justified by a compelling state interest, and is therefore unconstitutional. The court should accordingly grant summary judgment in favor of the Plaintiffs with respect to Count III of the SAC.

## III. RESOLUTION 2023-99 REMOVING GORDON AND STACKPOOLE FROM THE HUMAN RELATIONS COMMISSION VIOLATED THEIR FREEDOM OF SPEECH UNDER THE FIRST AMENDMENT.

Resolution 2023-82 is, and was, unconstitutional on July 9, 2023, when Gordon raised the Pride Flag on the flagpole on Joseph Campau Ave. because it violated the Free Speech and Establishment Clause provisions of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. In so doing, neither Gordon nor Stackpoole was violating the law. An unconstitutional Resolution is itself a violation of law, and a citizen who violates an unconstitutional,

and therefore unlawful, Resolution cannot be violating the law. Rather, the Councilmen who voted in favor of the unconstitutional Resolution violated the law by violating the Constitution. *See Ex Parte Young,* 209 U.S. 123, 124 (1908). (enforcement of an unconstitutional statute is a proceeding without authority and is illegal). By disobeying an unconstitutional government action, Gordon and Stackpoole engaged in an honored tradition in the United States of practicing civil disobedience. *See* Henry David Thoreau's "On the Duty of Civil Disobedience"; *Healy v. James,* 408 U.S. 169 (1972) (State college improperly denied recognition of a local chapter of Students for a Democratic Society due, in part, to its advocacy of civil disobedience).

By raising the Pride Flag in opposition to the unconstitutional Resolution, Gordon and Stackpoole were exercising their freedom of speech protected under the First Amendment. *See Lib v. University of Missouri,* 558 F.2d 848 (8th Cir. 1977) (University's refusal to recognize a student organization comprised largely of homosexuals which advocated on behalf of homosexuals violated their First Amendment rights of freedom of speech and association). The statement in Resolution 2023-99 that by raising the Pride Flag on the flagpole on Joseph Campau Ave. Gordon and Stackpoole did not maintain the respect and dignity of the rule of law is false, defamatory, and constitutes libel *per se* under Michigan law. By opposing the unconstitutional Resolution, Gordon and Stackpoole were maintaining

the respect and dignity of the United States Constitution, and of the rule of law.  It was the Councilmen who voted in favor of the unconstitutional Resolution who failed to maintain the respect and dignity of the rule of law.

By removing Gordon and Stackpoole as Commissioners, the Defendants unconstitutionally retaliated against them for exercising their freedom of speech under the First Amendment.  *See Pickering v. Board of Educ,* 391 U.S. 563 (1968) (School Board violated public school teacher's freedom of speech by terminating him for speaking publicly about a matter of public concern); *Board of County Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. 688 (1998) (County violated independent contractor's freedom of speech by terminating his contract with the County in retaliation for his public criticisms of the County government).

Since Resolution 2023-100 was based on the erroneous assertion that Gordon and Stackpoole failed to maintain the respect and dignity of the law by raising the Pride Flag on the flagpole on Joseph Campau Ave., the Resolution improperly, and unconstitutionally, stripped the Commission of authority and control over the flagpoles on Joseph Campau Ave.

The Court should accordingly grant Plaintiffs' motion for summary judgment with respect to Counts V and VI of the SAC, enter a declaratory judgment indicating that Resolutions 2023-99 and 2023-100 are unconstitutional, order that they be rescinded, and that Plaintiffs be reinstated as Commissioners.

IV.    **VIOLATION OF THE FREE SPEECH, ESTABLISHMENT, AND EQUAL PROTECTION CLAUSES REGARDING THE PASSAGE OF RESOLUTION 2023-100**

In passing Resolution 2023-100 rescinding authority of the Human Relations Commission to maintain and fly flags from the flagpoles on Joseph Campau Ave. based on the conduct of Gordon and Stackpoole in raising the Pride Flag to oppose passage of the unconstitutional Resolution 2023-82, the City violated the Free Speech and Establishment Clauses of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.  Resolution 2023-100 should accordingly be rescinded, and authority over display of flags on the flagpoles on Campau Ave. should be restored to the Human Relations Commission.

## <u>CONCLUSION AND RELIEF</u>

Based on the above Arguments, Plaintiffs' motion for summary judgment should be granted regarding Counts I, II, III, IV, V and VI of the SAC. A declaratory judgment should be entered holding that Hamtramck Resolutions 2023-82, 2023-99, and 2023-100 violate the U.S. Constitution, ordering that the Resolutions be permanently rescinded and that the Pride Flag and other flags which accompanied it be permanently re-displayed on the flagpoles on Joseph Campau Ave.

Respectfully submitted,

Marc M. Susselman
Attorney at Law
Attorney for the Plaintiffs
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

Dated: November 12, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2024, I electronically filed with the

Clerk of the Court the foregoing document using the CM/ECF system which will

send notification of such filing to all counsel of record.

/s/ Marc  M. Susselman (P29481)
Marc M. Susselman
Attorney for Plaintiffs

## <u>INDEX OF EXHIBITS</u>

Exhibit 1      Resolution 2013-102

Exhibit 2      Resolution 2021-73

Exhibit 3      Affidavit of Russ Gordon

Exhibit 4      Resolution 2023-82

Exhibit 5      Transcript of June 13, 2023 public hearing

Exhibit 6      Resolution 2023-99

Exhibit 7      Transcript of July 11, 2023 public hearing

Exhibit 8      Resolution 2023-100

Exhibit 9      Deposition transcript of Maxwell Garbarino

Exhibit 10   Deposition transcript of Karen Majewski

Exhibit 11   Deposition transcript of Mayor Ghalib

Exhibit 12   Deposition transcript of Russ Gordon

Exhibit 13   Deposition transcript of Mohammed Alsomiri

Exhibit 14   Deposition transcript of Kahlil Refai

Exhibit 15   Deposition transcript of Nareem Choudhury

Exhibit 16   Deposition transcript of Muhith Mahmood

Exhibit 17   Deposition transcript of Abu Musa

Exhibit 18   Deposition transcript of Mohammed Hassan

Exhibit 19   Affidavit of Maxwell Garbarino

Exhibit 20    Affidavit of Mayor Ghalib

Exhibit 21    Table of flags displayed on flagpoles on Joseph Campau Ave.

Exhibit 22    Defendants' Response to Plaintiffs' Third Request For Admissions

Exhibit 23    Defendants' Supplemental Answers To Plaintiffs' First Interrogatories

Exhibit 24    Affidavit of Prof. Andrew Flores

Exhibit 25    Excerpt from Esposito, <u>What Everyone Needs To Know About Islam</u>,
              Oxford University Press (2nd Ed. 2011)

Exhibit 26    Rehman and Polymenopoulou, <u>Is Green a Part of the Rainbow's
              Sharia, Homosexuality and LGBT Rights in the Muslim World,</u>
              37 Fordham International Law Journal 1 (2013)

Exhibit 27    Excerpt from The Meaning of The Glorious Qur'an,
              translated by Abdullah Yusuf Ali

Exhibit 28    The Quran The Eternal Revelation vouchsafed to Muhammad
              The Seal of the Prophets (1991), translated by Muhammad Zafrulla
              Khan

Exhibit 29    Hamtramck census for the years 2000-20023