UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUSS GORDON and CATHY STACKPOOLE,

                    Plaintiffs,                        Case Number 23-12812

v.                                            Honorable David M. Lawson

CITY OF HAMTRAMCK, HAMTRAMCK
CITY COUNCIL, and AMER GHALIB,

                    Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

From ancient times, flags have been symbols of patriotism, protest, affinity, alarm, warning and affirmation. They can express national pride, rally and motivate populations, inflame community spirit, provoke public criticism, and even stir violence. Flags can convey important messages.

This case concerns a dispute over the display of flags on a series of 18 flagpoles located on city sidewalks lining Joseph Campau Avenue in the City of Hamtramck's downtown historic district. It is undisputed that the flagpoles are on public property and owned by the City. At the center of the dispute is the display of a Gay Pride flag, once sanctioned by a city commission and then banned by city government after a change in administrations and a corresponding policy reversal. The plaintiffs, Russ Gordon and Cathy Stackpoole, were members of that commission before they were dismissed for pressing the issue. They brought suit alleging violations of the Free Speech and Establishment Clauses of the First Amendment, violation of the Equal Protection guarantee of the Fourteenth Amendment, and assorted other civil rights violations under state law. They now move for partial summary judgment. However, the discovery record does not establish

that they are entitled to a judgment as a matter of law on any of their claims.  The motion, therefore, will be denied.

I.

As the Supreme Court has recognized, "[f]lags are almost as old as human civilization. Indeed, flags *symbolize* civilization." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 253 (2022).  For decades, the Supreme Court has recognized "the communicative connotations of the use of flags." *Spence v. State of Wash.*, 418 U.S. 405, 410 (1974).  Flags, including the American flag, can be symbols of protest.  *E.g.*, *Stromberg v. California*, 283 U.S. 359 (1931).  Flags can be employed as "a form of symbolism comprising a 'primitive but effective way of communicating ideas . . .,' and 'a short cut from mind to mind.'"  *Spence*, 418 U.S. at 410 (quoting *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943)).  "Not just the content of a flag, but also its presence and position have long conveyed important messages about government.  The early morning sight of the stars and stripes above Fort McHenry told Francis Scott Key (and, through his poem, he told the rest of us) that the great experiment — the land of the free — had survived the British attack on Baltimore Harbor."  *Shurtleff*, 596 U.S. at 254 (citation omitted).  An American flag flown upside down came to be known as a distress signal by sailors at sea.  In fact, the United States Flag Code states that "[t]he flag should never be displayed with the union down, except as a signal of dire distress in instances of extreme danger to life or property."  4 U.S.C § 8(a).  Nonetheless, the notion of flying a flag upside down in protest dates back at least 50 years. *See Spence*, 418 U.S. 405.  The practice of using an inverted sign as a protest has subsequently been used to express dissent from both the right and the left.  As protestors stormed the Capitol Building on January 6, 2021, some carried inverted flags in support of the losing presidential

candidate who believed that his reelection loss was due to fraud at the polls.  It can be accepted that the display of flags can be a communicative source of intense human emotion.

On May 14, 2013, the Hamtramck City Council enacted Resolution 2013-102, which authorized a Human Relations Commission made up of 12 residents of the City to proceed with a project for "restoration" of the flagpoles lining Joseph Campau Avenue, including solicitation of funds and the purchase and display of flags to be flown.  That resolution states:

> FIRST:        The Human Relations Commission is hereby authorized to move forward with their flagpole restoration project.
>
> SECOND:        The Human Relations Commission is hereby authorized to solicit funds from interested parties, individuals or businesses for the sole purpose of the restoration and maintenance of city flagpoles, purchase of flags and plaques and ongoing maintenance of the project.

City of Hamtramck Resolution 2023-102, ECF No. 61-1, PageID.4753.

Plaintiff Russ Gordon was Chairman of the Human Relations Commission (HRC) in 2013 and served in that role until he was discharged from the post by a subsequent resolution passed in July 2023.  Throughout those years, he personally raised flags on the flagpoles in the Spring and took them down around Thanksgiving each year to avoid damage from harsh weather.  Among other things, the HRC accepted suggestions from residents about what flags should be raised. Gordon attested that over the years the flags of 27 different nations were flown, as well as flags representing the Cherokee Nation of Native American peoples, and the island of Sicily.  Russ Gordon aff., ECF No. 61-1, PageID.4758.  During that time frame, only one request to display a flag was rejected: a request to display the flag of Serbia.  Gordon stated that the request was denied because it was made by a person who was Croatian, not Serbian, and raising the flag along with the Bosnian flag, which previously had been approved for display, was viewed as likely to be unsettling to some residents since the City is home to populations of both Bosnian and Serbian emigrants, and those countries had been at war recently.

In 2021, the City Council passed another resolution authorizing the display of the Pride flag (emblematic of gay pride) during the month of June.  That resolution provided:

> WHEREAS the Arts and Culture Commission wishes to hold a ceremony on June 19, 2021 at the Zussman Park flagpole in recognition of Pride month.
>
> NOW THEREFORE BE IT RESOLVED by the City Council of the City of Hamtramck, Wayne County, Michigan to approve the display of a Pride flag at the Zussman Park flagpoles during the month of June, 2021.

City of Hamtramck Resolution 2021-73, ECF No. 61-1, PageID.4755.  Gordon was contacted by the chairperson of the Arts and Culture Commission, who specified the form of the Pride flag to be displayed.  However, Gordon was unable to procure a suitable flag until after June had passed, so the Pride flag was not displayed in 2021.

In May 2022, Gordon raised the Pride flag that was procured the prior year on one of the Joseph Campau Avenue flagpoles.  The then newly elected Mayor of Hamtramck, defendant Amer Ghalib, soon informed Gordon that the newly elected City Council wanted the Pride flag to be taken down.  Ghalib also convened a meeting in which Gordon participated, during which Ghalib reported that his office had received complaints from residents about the display of the Pride flag.  Gordon refused to take the flag down, and it was flown through Thanksgiving 2022.

Thereafter, in January 2023, plaintiff Cathy Stackpoole became a member of the HRC.

On June 13, 2023, the City Council held a public meeting that was attended by numerous City residents.  Among other items on the agenda was a new resolution limiting the flags to be displayed on the historic district flagpoles.  Thirty-seven residents rose to comment on the regulation, with 19 opposing it and 18 in favor.  However, prior to the meeting, 48 comments on the resolution were submitted by residents, with 47 in opposition to the resolution and only 1 supporting.  After public comments were heard, the Council unanimously approved resolution 2023-82, which stated:

WHEREAS, the City of Hamtramck is one of the most diverse cities in the United States, in which we should proudly promote and embrace its diversity; and

WHEREAS, the City must and will serve and treat its residents equally, with no discrimination, or special treatment to any group of people; and

WHEREAS, the City has authorized in the past, the Human Relations Commission to install nations['] flags on the City flagpoles to represent the international character of the City, Resolution 2013-102: and

WHEREAS, each religious, ethnic, racial, political, or sexually oriented group is already represented by the country it belongs to; and

WHEREAS, the City does not want to open the door for radical or racist groups to ask for their flags to be flown; and

WHEREAS, this resolution does not in any way, shape or form infringe upon the fundamental right of an individual or business in the City of Hamtramck to engage free speech. Nor does this resolution limit speech by public employees provided that such employees engage in such speech in a protected time, manner and place.

NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Hamtramck, Wayne County, Michigan, that the government of the City of Hamtramck does not allow any religious, ethnic, racial, political, or sexual orientation group flags to be flown on the City's public properties, and that only, the American flag, the flag of the State of Michigan, the Hamtramck Flag, the Prisoner of War flag and the nations' flags that represent the international character of our City shall be flown.

City of Hamtramck Resolution 2023-82, ECF No. 61-1, PageID.4765.

Following the passage of resolution 2023-82, plaintiffs Gordon and Stackpoole took the personal view that the resolution was an unconstitutional restriction on speech contrary to the First Amendment, and, on July 9, 2023, acting on their own initiative, Gordon and Stackpoole raised the Pride flag on one of the Joseph Campau Avenue flagpoles.  Hamtramck police were summoned by the Mayor and soon removed the flag.

At a City Council meeting on July 9, 2023, resolution 2023-99 was passed unanimously removing plaintiffs Stackpoole and Gordon from their positions on the HRC:

> WHEREAS, on July 9th, 2023, two members of the Human Relations Commission, Russ Gordon and Cathy Stackpoole, did intentionally violate the laws of the City of Hamtramck by flying a flag in contravention of Resolution 2023-82; and
>
> WHEREAS, in order to maintain the respect and dignity of the rule of law, the City must act to remove Russ Gordon and Cathy Stackpoole from the Human Relations Commission.
>
> NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Hamtramck, Wayne County, Michigan, that Russ Gordon and Cathy Stackpoole be immediately removed from their membership on the board of the Human Relations Commission to be replaced by candidates appointed by the Mayor and confirmed by the City Council at a later date.

City of Hamtramck Resolution 2023-99, ECF No. 61-1, PageID.4881.

Two days later, on July 11, 2023, the City Council unanimously passed resolution 2023-100, which stripped the HRC of authority over the flagpole displays:

> WHEREAS, the City of Hamtramck Human Relations Commission has controlled and maintained the flags along Jos Campau; and
>
> WHEREAS, on July 9th, 2023, members of the Human Relations Commission did willfully and blatantly violate the laws of the City of Hamtramck by flying a flag in contravention of the law designating that no flags of any religious, ethnic, racial, political, or sexual orientation group may be flown on City property; and
>
> WHEREAS, in order to maintain the respect and dignity of the rule of law, the City must act to rescind the Human Relations Commission's authority and control of the flag poles immediately and henceforth.
>
> NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Hamtramck, Wayne County, Michigan, that the Human Relations Commission of the City of Hamtramck be hereby and henceforth stripped of their authority and control over any and all flag poles on City property and that the City of Hamtramck shall henceforth hold dominion, authority and control over such flagpoles as the sole authority determining compliance under the laws of the City of Hamtramck and State of Michigan.

City of Hamtramck Resolution 2023-100, ECF No. 61-1, PageID.4960.

This lawsuit followed.

The plaintiffs filed their complaint on November 6, 2023, pleading claims for alleged violations of the Free Speech and Establishment Clauses of the First Amendment, violations of the

Equal Protection Clause of the Fourteenth Amendment, and assorted causes of action under Michigan state constitutional and statutory provisions.  After a period of discovery, they filed first and second amended pleadings, and then moved for partial summary judgment.  In their motion, the plaintiffs seek judgment as a matter of law only on their federal constitutional claims, and they pray for injunctive and declaratory relief nullifying resolutions 2023-82, 2023-99, and 2023-100, restoring the authority of the HRC over flagpole displays on public property, and reinstating the plaintiffs in their HRC positions.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute.  *Alexander*, 576 F.3d at 558 (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a

disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"). The plaintiffs therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, [they] must satisfy both the initial burden of production on the summary judgment motion — by showing that no genuine dispute exists as to any material fact — and the ultimate burden of persuasion on the claim — by showing that [they] would be entitled to a directed verdict at trial." William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

### A.

The plaintiffs contend that Hamtramck Resolution 2023-82 violates their rights under the First Amendment to free expression by limiting the types of flags that may be flown on the Joseph Campau flag poles, which, they insist, is a public forum. The public forum designation (a point crucial to their claim), they say, means that the regulation of the flags that can be displayed must be strictly scrutinized to ensure that it is content- and viewpoint-neutral, and must be reasonable in light of the purpose served by the forum. And they argue that even if the flagpoles are

considered a limited public forum, the regulation cannot withstand the scrutiny required when speech curtailment in such a forum is imposed by government regulation.

The defendants counter that the flagpoles in their current status are nonpublic forums, and that Regulation 2023-82 was not a regulation of private speech but instead converted the flagpole display to government speech, which is not subject to First Amendment limitations.

"The First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech.'" *Vidal v. Elster*, 602 U.S. 286, 292 (2024).  That prohibition is applicable to the states and their political subdivisions through the Fourteenth Amendment.  *Stromberg*, 283 U.S. at 368.  "In general, [the Court has] held that the First Amendment prohibits the Government from restricting or burdening 'expression because of its message, its ideas, its subject matter, or its content.'" *Vidal*, 602 U.S. at 292 (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)).  "'When enforcing this prohibition, [the Supreme Court's] precedents distinguish between content-based and content-neutral regulations of speech.'" *Ibid.* (quoting *National Institute of Family and Life Advocates [NIFLA] v. Becerra*, 585 U.S. 755, 766 (2018)).  "A content-based regulation 'targets speech based on its communicative content,' restricting discussion of a subject matter or topic." *Id.* at 292-93 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)) (cleaned up).  "As a general matter, a content-based regulation is presumptively unconstitutional and may be justified only if the [government] proves that it is narrowly tailored to serve compelling state interests." *Id.* at 293 (quoting *NIFLA*, 585 U.S. at 766).  The Supreme Court's] precedents distinguish further a particularly 'egregious form of content discrimination' — viewpoint discrimination." *Ibid.* (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  "A viewpoint-based regulation targets not merely a subject matter,

'but particular views taken by speakers on a subject,'" and such regulations "generally [are] subject to heightened scrutiny." *Ibid.*

Before evaluating the constitutional propriety of a government limitation on speech, the Court first must take note of the forum in which the regulation applies. "'Forum analysis requires a court first to categorize a location (or forum) to which a speaker seeks access for the purpose of expressive activity, and then to analyze the government's restriction on speech against the constitutional standard that governs in that forum.'" *Brindley v. City of Memphis, Tennessee*, 934 F.3d 461, 467 (6th Cir. 2019) (quoting *Agema v. City of Allegan*, 826 F.3d 326, 335 (6th Cir. 2016) (Merritt, J., dissenting in part)). "Courts recognize four types of fora: (1) the traditional public forum, (2) the designated public forum, (3) the limited public forum, and (4) the nonpublic forum." *Ibid.* (citing *Miller v. City of Cincinnati*, 622 F.3d 524, 534-36 (6th Cir. 2010)). "Restrictions on speech in traditional or designated public fora receive strict scrutiny, which means they must be 'necessary to serve a compelling state interest' and 'narrowly drawn to achieve that interest.'" *Ibid.* (citing *Miller*, 622 F.3d at 534). "Restrictions on speech in limited or nonpublic fora, however, need only be 'reasonable in light of the purpose served by the forum and . . . viewpoint neutral.'" *Ibid.* (citing 622 F.3d at 535).

There is yet another relevant distinction that also must be considered, which is whether the regulated expression is speech by private citizens (public speech) as opposed to speech by the government itself (government speech). "The First Amendment's Free Speech Clause does not prevent the government from declining to express a view." *Shurtleff*, 596 U.S. at 251 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-469 (2009)). "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Ibid.* (citing *Walker v. Texas Div., Sons of*

*Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015)).  "That must be true for government to work.  Boston could not easily congratulate the Red Sox on a victory were the city powerless to decline to simultaneously transmit the views of disappointed Yankees fans."  *Id.* at 251-52.  "The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks."  *Id.* at 252 (citing *Board of Regents of Univ. of Wis. v. Southworth*, 529 U.S. 217, 235 (2000)).

"The boundary between government speech and private expression can blur when . . . a government invites the people to participate in a program."  *Shurtleff*, 596 U.S. at 252.  "In those situations, [the Court must query] when does government-public engagement transmit the government's own message?  And when does it instead create a forum for the expression of private speakers' views?"  *Ibid.*  To address that question, the Court must "conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression."  *Ibid.*  That "review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors."  *Ibid.*  "[P]ast cases have looked to several types of evidence to guide the analysis, including: [1] the history of the expression at issue; [2] the public's likely perception as to who (the government or a private person) is speaking; and [3] the extent to which the government has actively shaped or controlled the expression."  *Ibid.* (citing *Walker*, 576 U.S. at 209-214).

This case begins and ends with *Shurtleff*, which is both squarely on point and constitutes the leading and most recent controlling authority regarding First Amendment treatment by the Supreme Court of flagpole displays.  The plaintiffs' arguments in support of their motion for partial summary judgment run counter to several venerable principles of First Amendment jurisprudence and to the reasoning expounded by the Court in *Shurtleff*.  In that case, the Court was asked to

determine if a religious group's free speech rights were abridged when their request to raise a Christian flag on one of three flagpoles outside Boston City Hall as part of a commemorative event was refused.  Boston previously had allowed several groups to hold events in the public area fronting City Hall and raise their flags on municipal flagpoles to signify the gatherings as part of the events.  To decide that case, the Court identified "[t]he first and basic question" as "whether Boston's flag-raising program constitutes government speech.  If so, Boston may refuse flags based on viewpoint." *Shurtleff*, 596 U.S. at 251.

1.

There certainly is room for debate about precisely what species of forum the Joseph Campau Avenue flagpoles presented before the passage of resolution 2023-82.  The record tends to favor the City's position that the flagpoles were not a forum for public speech, but instead constituted a forum for government speech, over which the City maintained control.  The factors are not dispositive either way, but in the end the distinction is immaterial since it is beyond debate that *after* resolution 2023-82 was passed, the flagpoles were relegated to service as a vehicle exclusively of government speech, fully under the City's control.

The application of the *Shurtleff* factors here for the most part tends to track the analysis set forth in that case, except when it comes to the degree of control exercised by the City over the flagpole forum, where there are material distinctions.

First, the *Shurtleff* Court recounted the long history of Boston's custom of displaying flags on public flagpoles, concluding that the historical record strongly favors the view that such displays, in general, constitute government speech.  *Shurtleff*, 596 U.S. at 253.  It is undisputed that the flagpoles here are similarly public-owned and situated on public property, and the parties

have not suggested any grounds on which the assessment of the general historical context of flagpole displays ought to vary in the circumstances of this case.

The second factor here, as in *Shurtleff*, is ambivalent, since the City of Hamtramck, like Boston, did (at least until 2023) permit the display of flags other than its own official banner.  That ambivalence prompted the *Shurtleff* Court to undertake a more searching inquiry that looked beyond the superficial examination of general historical trends.  *Shurtleff*, 596 U.S. at 253.   In *Shurtleff*, the Supreme Court found that this second factor cut both ways, since the hoisting of private flags was connected with the occurrence of permitted gatherings by private groups in the public plaza fronting City Hall.  As the Court observed: "Boston allowed its flag to be lowered and other flags to be raised with some regularity.  These other flags were raised in connection with ceremonies at the flagpoles' base and remained aloft during the events.  Petitioners say that a pedestrian glimpsing a flag other than Boston's on the third flagpole might simply look down onto the plaza, see a group of private citizens conducting a ceremony without the city's presence, and associate the new flag with them, not Boston. Thus, even if the public would ordinarily associate a flag's message with Boston, that is not necessarily true for the flags at issue here. Again, this evidence of the public's perception does not resolve whether Boston conveyed a city message with these flags."  *Id.* at 255-56.  This factor is similarly ambivalent for Hamtramck, since it is undisputed that numerous other flags were displayed on the public flagpoles over many years, including the flags of various nations, along with occasional displays of flags representing non-sovereign geographic regions and native peoples; moreover, on at least one occasion a formal resolution by the City administration called for the display of the Pride flag — notwithstanding the fact that no suitable flag was procured in time to fulfill that request.

However, turning to the third factor, the Court found it dispositive in *Shurtleff* that the City had exercised essentially no control over which flags could be flown, accepting all applicants without question, until it rejected the plaintiff's application to fly a "Christian" flag. Before that, Boston had accepted all applicants "without exception" and had "no written policies or clear internal guidance" about who could fly the flags or the contents of their message, unlike other municipalities sampled by the Court. *Shurtleff*, 596 U.S. at 256-57 (citing *Summum*, 555 U.S. at 472-73; *Walker*, 576 U.S. at 213).

Hamtramck's record on this point is not quite as freewheeling. The plaintiffs admit that at least one applicant previously was rejected for proposing the raising of a national flag (the flag of Serbia) that in the HRC's view might prompt angst between ethnic communities in the City owing to the history of war between that nation and another whose flag previously was raised. The fact that flag displays were not merely "rubber stamped" *en masse* and at least one suggestion was rejected, combined with the fact that the City Council occasionally resolved to dictate the flying of certain flags by official enactment, combine to create a question of fact about the extent to which the City retained control over the flagpole displays. A fact-finder reasonably could conclude that the circumstances here are distinguishable and relegated the flagpoles on Joseph Campau Avenue to the realm of an official forum reserved for government speech, which would not be subject to First Amendment regulation. It also reasonably could be found that the City exercised only transient authority over the flagpole displays and presented them otherwise at least in a limited capacity as an avenue for the expression of public sentiment.

2.

Nevertheless, Resolution 2023-82 indisputably changed the nature of the forum, a reality

overlooked by the plaintiffs.  For the reasons discussed below, that forum realignment was both permissible and constitutionally valid.  The plaintiffs' entire presentation fails to confront the fact that Resolution 2023-82 substantially altered the nature of the forum presented by Hamtramck's public flagpoles, and that alteration in turn is dispositive of their First Amendment claims.  They argue essentially that the City, having opened a forum for public speech in some capacity, must be prohibited in perpetuity from closing the forum to public speech and retaking its authority to exercise sole control over content presented in the venue.  That position is contrary to decades of First Amendment law, and the closure of a limited public forum by municipal authorities was expressly recognized as constitutionally permissible in *Shurtleff*.  *See* 596 U.S. at 258.

"Speech finds its greatest protection in traditional public fora, and government may not alter their public status without completely changing the fora's use, e.g. converting a public park to an office building."  *Make The Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004).  The plaintiffs contend that even if the flagpoles did not constitute a traditional public forum, they were a designated or limited public forum.  Nonetheless, it is well settled that "the government may decide to close a designated public forum," and First Amendment protections apply only as long as the forum remains open.  *Id.* at 143.

Moreover, *Shurtleff* explicitly called out the privilege of a municipal entity to enact tighter regulations that may alter the character of the forum in question.  As the Court observed: "All told, while the historical practice of flag flying at government buildings favors Boston, the city's lack of meaningful involvement in the selection of flags or the crafting of their messages leads us to classify the flag raisings as private, not government, speech — *though nothing prevents Boston from changing its policies going forward*."  *Shurtleff*, 596 U.S. at 258 (emphasis added).  The Court also endorsed the type of regulations enacted in other cities that expressly limit and specify

which flags can be displayed, indicating that such an enactment would tip the balance of the forum-classification analysis: "Boston *could easily have done more to make clear it wished to speak for itself by raising flags*.  Other cities' flag-flying policies support our conclusion.  *The City of San Jose, California, for example*, provides in writing that its 'flagpoles are not intended to serve as a forum for free expression by the public,' and *lists approved flags that may be flown 'as an expression of the City's official sentiments.'*"  *Shurtleff*, 596 U.S. at 257-58 (emphasis added).  The regulation here fits precisely into that niche.

Regulation 2023-82 follows the exact pattern called out in *Shurtleff* as both valid and dispositive, where it prescribed a discrete listing of flags representing only governmental and international sovereigns as approved for display, plus the prisoner-of-war tribute flag.  By enacting that regulation, the City tipped the balance and converted the flagpoles from a forum for public speech in some capacity to a nonpublic forum reserved for government speech only.   Such a closure of a formerly (at least partially) public forum is constitutionally permissible, even if it results in prospectively foreclosing private speech that was allowed under prior regulations.  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("[A] state is not required to indefinitely retain the open character of [a] facility"); *Satanic Temple v. City of Belle Plaine, Minnesota*, 80 F.4th 864, 868 (8th Cir. 2023) ("The Satanic Temple argues that it was viewpoint discrimination to close the Park after its display was ready. But '[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property.'  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985).  And the Government is not required to keep limited public forums open.  *See Perry*, 460 U.S. at 46.  The City closed the limited public forum to everyone, not just speakers

with certain views.  The Satanic Temple has not plausibly alleged that closing the Park as a limited public forum was unreasonable or viewpoint discriminatory.").

It is well settled, and not questioned by the plaintiffs, that "[t]he First Amendment's Free Speech Clause does not prevent the government from declining to express a view," *Shurtleff*, 596 U.S. at 251 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-469 (2009)), and "[t]he Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks," *id.* at 252 (citing *Board of Regents of Univ. of Wis. v. Southworth*, 529 U.S. 217, 235 (2000)).  Following the enactment of Resolution 2023-82, which converted the flagpoles to a nonpublic forum, the City's conduct in regulating flagpole displays was no longer subject to First Amendment limitations, and the plaintiffs have not cited any legal authority holding that the First Amendment afforded them any right to invade such a nonpublic forum to propagate private speech of their own choosing.

### 3.

Even if Resolution 2023-82 is subject to First Amendment scrutiny, it passes muster as a viewpoint-neutral regulation reasonably tailored to serve a permissible public purpose, that is, the City's legitimate interest in quashing public controversy and foreclosing contentious civil rights litigation that likely would ensue — as it did in this case — from permitting the public display of flags representing various competing and contentious social and political viewpoints.

Contrary to the plaintiffs' argument, Resolution 2023-82 is entirely viewpoint-neutral because it does not permit the display of flags representing *any* political or social viewpoints at all. Instead, it prohibits the display of *all* viewpoint-related flags in an entirely neutral manner.  *Vidal*, 602 U.S. at 293-94 ("The names clause does not facially discriminate against any viewpoint.  No matter the message a registrant wants to convey, the names clause prohibits marks that use another

- 17 -

person's name without consent. It does not matter whether the use of the name is flattering, critical or neutral. The Government is thus not singling out a trademark based on the specific motivating ideology or the opinion or perspective of the speaker.") (citing *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019) (explaining that a viewpoint-based trademark law "distinguishes between two opposed sets of ideas")).

Another key point: the regulation also is not content-based, because it identifies categorically those flags that can be displayed — only official banners of local, state, national, and international sovereigns — and prohibits the display of all other flags presented by private interests, regardless of form or content. *C.f. Vidal*, 602 U.S. at 294-95 ("The names clause turns on the content of the proposed trademark — whether it contains a person's name. If the trademark does contain a person's name, and the registrant lacks that person's consent, then the names clause prohibits registration. Because trademarks containing names are treated differently from trademarks conveying other types of ideas, the names clause is content based.") (cleaned up). In this case, the regulation prohibits the display of all flags other than those specified — i.e., no flags may be presented by any private entity on public flagpoles, regardless of their content or message.

Finally, to pass muster under the First Amendment, "[r]estrictions on speech in limited or nonpublic fora . . . need only be 'reasonable in light of the purpose served by the forum and . . . viewpoint neutral.'" *Ibid.* (citation omitted). The regulation here measures up on both accounts. As noted above, even if the regulation is regarded as discriminating in some sense based on *content*, it is entirely neutral as to *viewpoint*. Similar regulations limiting flagpole displays to only those of political subdivisions, sovereign nations, and official banners have been upheld as constitutionally permissible. The Supreme Court expressly endorsed such regulations as both permissible and dispositive of any First Amendment challenge, since the effect of such a regulation

would be to transpose the flagpole display into the realm of government speech exempt from First Amendment limitations.  Further, on indistinguishable facts, other district courts have upheld materially identical restrictions on flag displays against First Amendment challenges.  *Sons of Confederate Veterans, Virginia Div. v. City of Lexington, Va.*, 894 F. Supp. 2d 768, 775-76 (W.D. Va. 2012), *aff'd*, 722 F.3d 224 (4th Cir. 2013) ("The Constitution does not compel a municipality to provide its citizens a bully pulpit, but rather requires it to refrain from using its own position of authority to infringe free speech. . . . The city that cracks the door to private expression on flag poles practically invites litigation from other groups whose messages it would rather not hoist above the city.").  The same reasoning dooms the First Amendment challenge in this case.

The plaintiffs have not established that they are to a judgment as a matter of law on their First Amendment free speech claim.

## B.

The plaintiffs also bring a claim under another part of the First Amendment, positing that the enactment of Resolution 2023-82 that effectively banned display of the Pride flag violated the Establishment Clause because it was promulgated "to accommodate a segment of the Hamtramck community which was hostile to the rights of the gay community based on their personal religious views."  The plaintiffs cite several statements in this record by city councilpersons condemning homosexuality and expressing hostility to the sentiments that the Gay Pride flag may symbolize.

However, the plaintiffs' "evidence" of subjective motivation to advance a religious viewpoint is irrelevant to the analysis of alleged Establishment Clause violations.  "The eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act."  *McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 862 (2005) (cleaned

up).  "[I]t is virtually impossible to determine the singular 'motive' of a collective legislative body, and [the Supreme] Court has a long tradition of refraining from such inquiries. . . . The First Amendment does not refer to the purposes for which legislators enact laws, but to the effects of the laws enacted[.]  This does not put [the Court] in the business of invalidating laws by reason of the evil motives of their authors."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 558 (1993) (Scalia, J., concurring in part) (cleaned up).  Accordingly, "[i]t is a familiar principle of constitutional law that [courts] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.  As the [Supreme] Court long ago stated: 'The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted.'"  *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (quoting *McCray v. United States*, 195 U.S. 27, 56 (1904)); *see also Church of Lukumi Babalu*, 508 U.S. at 558-59 ("Had the Hialeah City Council set out resolutely to suppress the practices of Santeria, but ineptly adopted ordinances that failed to do so, I do not see how those laws could be said to 'prohibi[t] the free exercise' of religion.  Nor, in my view, does it matter that a legislature consists entirely of the pure-hearted, if the law it enacts in fact singles out a religious practice for special burdens.  Had the ordinances here been passed with no motive on the part of any councilman except the ardent desire to prevent cruelty to animals (as might in fact have been the case), they would nonetheless be invalid.") (Scalia, J., concurring in part).

On its face, Regulation 2023-82 is devoid of any reference or endorsement of any religion or viewpoint.  In fact, it evidences an intent by the City to avoid endorsing any private credo at all.  Whether or not any subjective animus toward a particular viewpoint motivated the adoption of the regulation is entirely irrelevant, since "[t]he Supreme Court [has] repeatedly explained that

- 20 -

legislators' personal motivations for enacting a regulation are irrelevant to First Amendment challenges to government regulations; [and] only the government's asserted justifications are pertinent." *Adams Outdoor Advert. Ltd. P'ship v. City of Madison*, No. 17-576, 2018 WL 3242282, at *3-4 (W.D. Wis. July 3, 2018). The justifications advanced here — foreclosing public controversy and avoiding contentious litigation over displays of competing viewpoints — have been found to be constitutionally valid by courts that upheld regulations with indistinguishable limitations on flagpole displays. *See ibid.*

## C.

Finally, the plaintiffs challenge the city's action as violative of the Equal Protection Clause of the Fourteenth Amendment. They maintain that because Resolution 2023-82 allows the display of some flags but not others, it violates the Equal Protection Clause, citing cases overturning regulations that prohibited picketing near schools or residences but made exceptions for picket lines related to labor disputes. They also contend that their act of raising the Gay Pride flag on a City flagpole after passage of the unconstitutional resolution was an incident of civil disobedience against an unlawful regulation, and the City's responses in Regulations 2023-99 and 2023-100, which removed the plaintiffs from their positions and then stripped the Human Relations Commission of its authority over the flagpoles, were unconstitutional violations of the plaintiffs' right to free speech and also violated the Establishment and Equal Protection Clauses.

"A selective-enforcement claim [under the Equal Protection Clause] requires the plaintiff to demonstrate the following elements: 'First, [the state actor] must single out a person belonging to an identifiable group, such as . . . a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution

must have a discriminatory effect on the group which the defendant belongs to.'" *Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 394-95 (6th Cir. 2016) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)).

The plaintiffs devoted almost no attention in their briefing to their Equal Protection claim, and they have made no effort to identify any factual basis for that cause of action. Furthermore, they did not even identify with any certainty the elements of the claim. Presumably, the claim presents as some variety of selective prosecution, based on punishment of the plaintiffs for their defiance of the 2023-82 resolution. But the plaintiffs have made no effort to identify what group they are members of; and, as discussed above, when they raised the Gay Pride flag following the enactment of resolution 2023-82, they were not asserting any valid right protected by the First Amendment. The plaintiffs also made no effort to identify other persons or groups who engaged in similar transgressions and were not punished. And they have not specified how they suffered any unconstitutional discrimination based on their act of trespass in raising a prohibited banner on public property. The entire argument concerning this claim consists of a single paragraph at the end of the plaintiffs' brief, devoid of any citations of record evidence or legal authority. That minimalistic effort to sustain the Equal Protection claim consists of little more than the bare recital of the elements of a constitutional claim devoid of any factual detail, and the plaintiffs have not carried their burden of demonstrating the absence of any genuine issue of material fact on this claim.

### III.

The plaintiffs have not come forth with evidence in this record that eliminates all factual disputes and establishes their right to relief on their federal claims as a matter of law. Nor does their legal position suggest the prospect of ultimate success. Although in some circumstances, the

Court may grant summary judgment to the nonmoving parties when the record supports that outcome, *see* Fed. R. Civ. P. 56(f)(1), counsel for the defendants expressly stated at oral argument that his client instructed him not to move for that relief.  In light of that disavowal, the Court is reluctant to give the notice contemplated by Rule 56(f) or to risk trenching upon the principle of party presentation, *see In Re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, --- F.4th ---, No. 24-1137, 2025 WL 1904525, at *4 (6th Cir. July 10, 2025) (citing *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)), even when efficiencies might be realized.  In the present procedural posture, all that may be decided is that summary judgment for the plaintiffs is not appropriate.

Accordingly, it is **ORDERED** that the plaintiffs' motion for partial summary judgment (ECF No. 61) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 14, 2025